**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| NOVACLOUD LICENSING, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORP.,<br><br>*Defendant*. | Case No. 2:25-cv-00700-JRG-RSP<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORP.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. LEGAL STANDARD ..... 2

III. THE ’262 PATENT ..... 3

A. “host” (Claims 1–17) ..... 3

B. “resource frame of an application” (Claims 1–17) ..... 7

C. “operations profile of an application” (Claims 1–17) ..... 9

IV. THE ’348 PATENT ..... 11

A. Applicable Law on Coined Terms in a Claim ..... 12

B. “activity threshold value” (Claims 1–3, 5–15, 17) ..... 13

C. “loading” (Claims 1–3, 5–15, 17) ..... 16

D. “saturation threshold value” (Claims 1–3, 5–15, 17) ..... 18

V. THE ’480 PATENT ..... 21

A. “modifying an injection virtual machine (VM) image” ..... 21

1. The Error Is Not Minor or Obvious on the Patent’s Face ..... 22

2. The Correction Is Subject to Reasonable Debate ..... 24

3. The Prosecution History Is Not Dispositive in Light of the Other Factors ..... 26

VI. CONCLUSION ..... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Innovative Properties Co. v. Tredegar Corp.*,
725 F.3d 1315 (Fed. Cir. 2013) ........ 12, 13

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
967 F.3d 1285 (Fed. Cir. 2020) ........ 12

*Autoconnect Holdings LLC v. Toyota Motor Corp.*,
No. 2:24-CV-00802-JRG-RSP, 2026 WL 1601924 (E.D. Tex. Feb. 11, 2026) ........ 7

*BSG Tech LLC v. BuySeasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018) ........ 12

*Canatex Completion Sols., Inc. v. Wellmatics, LLC*,
159 F.4th 39 (Fed. Cir. 2025) ........ 22, 23

*CBT Flint Partners, LLC v. Return Path, Inc.*,
654 F.3d 1353 (Fed. Cir. 2011) ........ 22, 23

*Cell & Network Selection LLC v. AT&T Inc.*,
2014 WL 3671029 (E.D. Tex. July 23, 2014) ........ 16

*Fractus S.A. v. ZTE Corp.*,
2018 WL 4282783 (E.D. Tex. Sept. 7, 2018) ........ 13

*Grp. One, Ltd. v. Hallmark Cards, Inc.*,
407 F.3d 1297 (Fed. Cir. 2005) ........ 23, 26

*H-W Tech., L.C. v. Overstock.com, Inc.*,
758 F.3d 1329 (Fed. Cir. 2014) ........ 23, 25, 26

*Indacon, Inc. v. Facebook, Inc.*,
824 F.3d 1352 (Fed. Cir. 2016) ........ 13, 15, 17

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
383 F.3d 1295 (Fed. Cir. 2004) ........ 13, 15

*Kids2, LLC v. TOMY Int'l, Inc.*,
No. 2023-1524, 2025 WL 87335 (Fed. Cir. Jan. 14, 2025) ........ 9

*Levitation Arts, Inc. v. Fascinations Toys & Gifts, Inc.*,
No. A-07-CA-990-SS, 2008 WL 11334126 (W.D. Tex. Apr. 15, 2008) ........ 24

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ........ 15

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
133 F.3d 1473 (Fed. Cir. 1998) ........ 14

*Nanoco Technologies Ltd. v. Samsung Elecs. Co.*,
Dkt. 84, No. 2:20-CV-00038-JRG (E.D. Tex. May 11, 2021) ..... 6

*Novo Indus., L.P. v. Micro Molds Corp.*,
350 F.3d 1348 (Fed. Cir. 2003) ..... 21, 22

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ..... 3

*Opal Run, LLC v. C & A Mktg., Inc.*,
No. 2:16-CV-00024-JRG-RSP, 2017 WL 413163 (E.D. Tex. Jan. 31, 2017) ..... 2

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ..... 2

*R2 Sols. LLC v. Am. Airlines, Inc.*,
No. 4:22-CV-353, 2023 WL 2761124 (E.D. Tex. Apr. 3, 2023) ..... 7

*Renishaw PLC v. Marposs Societa' per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998) ..... 2

*RFCyber Corp. v. Google LLC*,
No. 2:20-CV-274-JRG, 2021 WL 5357465 (E.D. Tex. Nov. 17, 2021) ..... 11

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
511 F.3d 1132 (Fed. Cir. 2007) ..... 13, 15, 19

*Sol IP, LLC v. AT&T Mobility LLC*,
2019 WL 6878836 (E.D. Tex. Dec. 16, 2019) ..... 13, 15

*STMicroelectronics, Inc. v. Motorola, Inc.*,
327 F. Supp. 2d 687 (E.D. Tex. 2004) ..... 25

*Synchronoss Technologies, Inc. v. Dropbox, Inc.*,
987 F.3d 1358 (Fed. Cir. 2021) ..... 24

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) ..... 2

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ..... 2, 16

*TQP Dev., LLC v. Merrill Lynch & Co.*,
No. 2:08-CV-471, 2012 WL 1940849 (E.D. Tex. May 29, 2012) ..... 7, 11

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
587 F.3d 1339 (Fed. Cir. 2009) ..... 22

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ..... 2

*Widevine Techs., Inc. v. Verimatrix, Inc.*,
No. 2:07-CV-321, 2009 WL 3734106 (E.D. Tex. Nov. 4, 2009) ..... 13

## TABLE OF EXHIBITS

| **Exhibit** | **Document** |
|---|---|
| Exhibit 1 | *Nanoco Technologies Ltd. v. Samsung Elecs. Co.*, No. 2:20-CV-00038-JRG, Dkt. 84 (E.D. Tex. May 11, 2021) |

# TABLE OF ABBREVIATIONS

| Term | Meaning |
|---|---|
| IBM | Defendant International Business Machines Corporation |
| NovaCloud | Plaintiff NovaCloud Licensing, LLC |
| ’262 patent | U.S. Patent No. 9,900,262 |
| ’348 patent | U.S. Patent No. 8,407,348 |
| ’480 patent | U.S. Patent No. 10,691,480 |
| Br. | NovaCloud’s Claim Construction Brief (Aug. 28, 2026) (Dkt. 86) |
| Ex. | Exhibit |

# I. INTRODUCTION

Each of IBM's constructions is rooted in the claim language or lexicography in the specification. Indeed, most of the disputed terms are expressly defined in the patent specifications and IBM's constructions adopt that lexicography. For the remaining terms, IBM's constructions clarify the claim terms for the jury in an accessible manner without altering the claim scope at all. NovaCloud's plain meaning constructions ignore the clear bases in the intrinsic record for IBM's constructions and would leave the jury confused about the scope of the asserted claims.

For the '262 patent, "host"—the first disputed term—is expressly defined in the specification. The two other disputed terms—"resource frame of an application" and "operations profile of an application"—are not defined in the specification, but their meaning is evident and unambiguous from the express requirements in the language of the independent claims. IBM's constructions adopt those clear definitions from the claims and specification to assist the jury.

For the '348 patent, the three disputed terms—"activity threshold value," "loading," and "saturation threshold value"—are coined terms defined in the specification, having no known meanings in the art. They are terms that the patentee used to describe data values referenced in the claims. A skilled artisan would have understood what these terms mean only by reading the definitions in the patent. IBM asks the Court to apply those definitions here.

Finally, for the '480 patent, the Court should reject NovaCloud's request for a retroactive judicial correction of the phrase "modifying an injection virtual machine image" by replacing it with an entirely distinct virtual machine feature with a different functionality: "modifying a virtual application VM image." NovaCloud does not come close to meeting the "rigorous" standard for judicial correction, which is limited to instances of minor typographical errors that are obvious from the face of the patent and where the correction cannot be subject to reasonable debate.

## II. LEGAL STANDARD

Claim construction "begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). The claims "define the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). The claims' terms carry their ordinary and customary meaning to a person of ordinary skill in the art at the time of the invention, "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313.

"The claims, of course, do not stand alone." *Id.* at 1315. They "must be read in view of the specification, of which they are a part." *Id.* Indeed, the specification is "the single best guide to the meaning of a disputed term" (*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)), and "may assist in resolving ambiguity where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). A patentee may depart from a term's plain meaning by "set[ting] out a definition and act[ing] as his own lexicographer," or by "disavow[ing] the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *accord Opal Run, LLC v. C & A Mktg., Inc.*, No. 2:16-CV-00024-JRG-RSP, 2017 WL 413163, at *4 (E.D. Tex. Jan. 31, 2017). The definition need not be express: the specification "acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Vitronics*, 90 F.3d at 1582. Where the patentee's definition appears "with reasonable clarity, deliberateness, and precision," "the definition selected by the patent applicant controls." *Renishaw*, 158 F.3d at 1249.

A determination that a claim term "needs no construction" or has the "plain and ordinary meaning" "may be inadequate . . . when reliance on a term's 'ordinary' meaning does not resolve

the parties' dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). In such cases, "the court, not the jury, must resolve that dispute." *Id.* at 1360.

## III. THE '262 PATENT

The '262 patent concerns management of applications in so-called "shared environments," which "separate computer hardware and applications by virtualizing the hardware" into one or more virtual machines, each of which may run an application. *See* '262 patent, 1:19–37. The patent purports to address the problem of "gather[ing] adequate information about how to set up and manage applications running in a shared environment" by "monitor[ing] different resources in a virtualized environment [where] the resources may be shared by different applications." *Id.* at 1:60–2:4; 4:9–15. The patent claims recite that each of "at least two hosts" sends a "resource frame of the application" to a "resource manager," which "combin[es]" "at least two resource frames [to] form an operations profile of an application using [the] shared environment." *Id.*, *e.g.*, cl. 1. This information may be used to "control and adapt resource[] allocation on the basis of application[] behavior." *Id.* at 4:34–39. For instance, the operations profile of one application may show it "us[es] a lot of bandwidth" while the operations profile for a second application may show it "us[es] a lot of CPU capacity"; those applications "may be suitable to match"—*i.e.* deploy on the same host—"because the applications together may be well utilizing different resource components at [that] host." *Id.* at 5:63–6:10.

### A. "host" (Claims 1–17)

| IBM's Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Single physical machine including all its software. | No construction necessary. |

IBM's construction adopts the '262 patent specification's express definition of "host": "[a] single physical machine including all its software may sometimes be denoted a host." *Id.* at 1:44–45. Nothing in the patent suggests a different understanding. NovaCloud exclusively points to a

*different* component—a *virtual* machine—that is expressly distinguished throughout the specification from a "host," which is a *physical* machine with hardware that runs software.

The specification consistently describes a "host" as a physical machine consisting of hardware that runs software.[1] For instance, Figure 7b describes the "host" as comprising "processors P250" and "memories M260" that execute "computer program products" "carried by a medium 255, such as CD, DVD, flash memory, or downloadable objects." *Id.* at 9:1–19. These processors are physical computer hardware, *i.e.*, "general purpose microprocessors, instruction set processors and/or related chips sets and/or special purpose microprocessors such as Application Specific Integrated Circuits (ASICs)." *Id.* at 9:1–8. Likewise, the "memories M260" are "flash memory, a Random-Access Memory (RAM), a Read-Only Memory (ROM) or an Electrically Erasable Programmable ROM (EEPROM)." *Id.* at 9:19–22.

In addition, the patent repeatedly and unambiguously distinguishes the physical host from "virtual machines." *See, e.g.*, *id.* at 4:48–50 ("An example of *hosts* 120 are shown in FIG. 1 with a resource component 130, controlled by a hypervisor 140 and a *virtual machine* 150."). The patent, for example, explains that "[a] number of virtual machines may be operated on the same physical hardware." *Id.* at 1:31–33. A "hypervisor" "manage[s] the virtual machine on the physical hardware" and "allocate[s] resources for the virtual machine such as bandwidth, CPU power, memory capacity, or storage capacity" from that physical hardware. *Id.* at 1:38–44. Thus, every embodiment of the patent describes the same configuration of these separate elements: as

[1] NovaCloud's assertion that the patent "describes hosts functionally, not structurally" is wrong. Br. 8. The patent defines a host as a "single physical machine including all its software," and the passage on which NovaCloud relies simply identifies the "computer program product" (*i.e.* software) that may be run on the host. '262 patent, 3:1–4.

shown below, a physical "host" (**blue**) with "resource components" that are provided to a "virtual machine" (**green**) running on that physical "host" via a "hypervisor" (**orange**):




Fig. 1




Fig. 6

*Id.*, Figs. 1 & 6 (annotated).[2]

NovaCloud argues that various statements in the '262 patent specification contradict IBM's construction. Br. 8–9. NovaCloud is wrong. All of NovaCloud's cited statements refer to a virtual machine, *not* a host. In particular, while some of those disclosures refer to a virtual machine (*e.g.* '262 patent, 1:26–29),[3] the others distinguish between physical hardware (the "host") and virtualization (the "virtual machine") (*e.g. id.* at 1:19–23 ("It is becoming more common to share

---

[2] Contrary to NovaCloud's assertion (Br. 8), these figures further confirm the patent's statement that "hosts may be arranged in different ways" simply refers to the fact that one or more "hosts" may exist in a "shared environment," as depicted by the dotted-line boxes under host 120 in Figures 1 and 6. '262 patent, 4:43–48.

[3] The prior application NovaCloud cites likewise discusses "virtual machines"—not hosts—and confirms virtual machines are distinct from "physical hardware." Br. 9 (citing Dkt. 86-04).

hardware platforms among applications. It is further becoming more common to separate computer hardware and applications by virtualizing the hardware. Such solutions may be described as shared environments . . . .”)). Thus, at most, NovaCloud’s disclosures actually *confirm* that the patent distinguishes between the physical host(s) and virtual machine(s).

Furthermore, contrary to NovaCloud’s argument, the specification does not distinguish between a “physical host” and some other type of undisclosed “host.” Br. 8–9. NovaCloud’s reference to the specification shows, in connection with Figure 3, that the two depicted “resource frames” (170) “may originate from the *same* physical host 120” or “may also originate from *different* physical hosts 120.” ’262 patent, 5:14–18. Thus, the distinction there is between resource frames coming from the same or different hosts, not between a “physical host” and something else. Indeed, a “host” must be a “physical host” because the patent defines a host as “a single physical machine including all its software.” *Id.* at 1:44–45.

Accordingly, IBM’s construction, which adopts the patent’s lexicography, should apply. *See, e.g.*, Ex. 1, *Nanoco Technologies Ltd. v. Samsung Elecs. Co.*, No. 2:20-CV-00038-JRG, Dkt. 84 at 7, 12–14 (E.D. Tex. May 11, 2021) (finding lexicography where patentee “clearly set forth a definition of the disputed claim term . . . with reasonable clarity,” despite the disputed term having “a common meaning”). The patent consistently discloses systems in which physical hardware and software make up a host, on which one or more virtual machines may execute and be granted access to resources of the host. Although IBM’s construction conforms to those disclosures, NovaCloud’s only response is to blur the lines between the “host” and *other* components mentioned in the patent, *e.g.*, a “virtual machine.” NovaCloud’s effort to interpret this claim language contrary to the patent’s lexicography and disclosures should be rejected.

### B. "resource frame of an application" (Claims 1–17)

| IBM's Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Representation of an application's resource usage on a single host. | No construction necessary. |

IBM's construction directly reflects the claims' requirements, phrased in a manner that a jury will understand. NovaCloud contends IBM's construction "changes the language and meaning of the claims," but notably does not and cannot explain *how* IBM's construction would alter the claims' meaning—because it does not. Br. 10. NovaCloud also has provided no evidence that "resource frame of an application" is a well-known term in the relevant art, nor does the '262 patent define that term. The jury cannot be left to guess at its meaning, and thus IBM's construction—which merely clarifies the requirements already present in the claims—should be adopted. *TQP Dev., LLC v. Merrill Lynch & Co.*, No. 2:08-CV-471, 2012 WL 1940849, at *2 (E.D. Tex. May 29, 2012) ("[S]ome construction of the disputed claim language will assist the jury to understand the claims"); *see, e.g.*, *R2 Sols. LLC v. Am. Airlines, Inc.*, No. 4:22-CV-353, 2023 WL 2761124, at *16–17 (E.D. Tex. Apr. 3, 2023); *Autoconnect Holdings LLC v. Toyota Motor Corp.*, No. 2:24-CV-00802-JRG-RSP, 2026 WL 1601924, at *23 (E.D. Tex. Feb. 11, 2026).

IBM's construction consolidates the requirements of the "resource frame of an application" directly from the claims without imposing any additional requirements. All asserted claims require the "resource manager" to "determine" a "metric of a resource component" and to "transmit" to each host "an instruction to measure the metric[s]." *See* '262 patent, cls. 1, 9, 17. The response to that "instruction," sent by "each respective host," is "resource frame of [an] application"—the disputed term for construction. *Id.* Thus, the resource frame of an application is a measurement of a metric of a resource component used by a particular application (*i.e.* "[a] representation of an

application's resource usage") individually for "each respective host" (*i.e.* "on a single host"). *See id.* That is what the claims already require, and which IBM's construction makes clear.

IBM's construction is consistent with the patent specification and the solution that patent purports to provide. The patent describes a "shared environment" in which "an application operat[es] on an operating system," "the operating system run[s] on a virtual machine," and one or more virtual machines are "operated on the same physical hardware." *Id.* at 1:26–33. The patent addresses the "problem" of "gather[ing] adequate information about how to set up and manage applications running in a shared environment," given each application's "resource demands." *Id.* at 1:60–2:2. The purported "solution" is "synchronizing on a resource frame basis the resources metrics of the applications using the resources" to "allow[] understanding of which and how resources are used, and which applications use them" and ultimately provide the ability to "control and adapt resources allocation on the basis of applications behavior." *Id.* at 4:25–39; *see also id.* at 5:63–6:10 (describing example of "match[ing]" applications "utilizing different resource components"). To accomplish that goal, the claims require that each host provides a "resource frame of [an] application," which is a "measure[ment]" of a "metric of a resource component" used by a particular application. *Id.*, cls. 1, 9, 17. Thus, the resource frame must necessarily be some "[r]epresentation of an application's resource usage," as required by the claims and reflected in IBM's construction.

NovaCloud's reference to the meaning of "frame" does not change that requirement. NovaCloud points to "examples of what constitutes a 'frame,'" in the patent (Br. 10), but those examples are irrelevant because IBM's construction would not exclude *any* of them. These disclosures merely state that "a resource frame compris[es] time slots" or equivalent. *See* '262 patent, 2:58–59, 3:7–9, 3:16–19, 3:41–45, 4:27–34, 4:65–5:4. Regardless, a resource frame of an

application that specifically comprises "time slots" is still a "representation of an application's resource usage," consistent with IBM's construction. *See id.* at 4:28–32 ("[T]he solution proposes to measure and collect same kind of metrics for resources in consecutive time slots for resources used by the applications . . . ."). Indeed, the embodiment requiring time slots is recited in *dependent* claims 2 and 10, and thus is not and could not be excluded by IBM's broader construction for independent claims 1, 9, and 17. *Kids2, LLC v. TOMY Int'l, Inc.*, No. 2023-1524, 2025 WL 87335, at *4 (Fed. Cir. Jan. 14, 2025) ("Independent claim 1 must be broad enough to contain the full scope of its dependent claims . . . .").

Finally, NovaCloud incorrectly contends IBM's construction "adds a 'single host' requirement found nowhere in the claim language." Br. 10. That is wrong. The claims expressly require that the resource frame is requested from, provided by, and contains resource information pertaining to a single host. *See, e.g.*, '262 patent, cl. 1 ("transmitting an instruction to measure the metric *to each respective host*; receiving a respective resource frame of the application *from each respective host*"). IBM's construction adopts that requirement. IBM's construction therefore should be adopted because it clarifies the claim requirements for the jury without adding requirements or deviating from the specification's disclosures.

**C. "operations profile of an application" (Claims 1–17)**

| IBM's Proposed Construction | Plaintiff's Proposed Construction |
| --- | --- |
| Representation of an application's resource usage across multiple hosts. | No construction necessary. |

IBM's construction clarifies the requirements of the phrase "operations profile of an application" based on the language of the claims. The claims recite that an "operations profile of an application" is created by "combining resource frames coming from the at least two hosts." '262 patent, cl. 1. Thus, because a "resource frame" is a "representation of an application's

resource usage on a *single* host" (under IBM's construction, *supra* § III.B) and the "operations profile" combines those resource frames from "at least two hosts," an "operations profile" is a "representation of an application's resource usage across *multiple* hosts." NovaCloud admits that this is the relationship between the resource frame and the operations profile. Br. 11–12. NovaCloud's only response is to reiterate its disagreement with IBM's construction of "resource frame of an application." As discussed above, however, NovaCloud's argument on that term should be rejected. *Supra* § III.B.

IBM's construction is consistent with the specification and purpose of the alleged invention. The specification explains that an operations profile is formed by "at least two resource frames" and that "each application may have its own operations profile, depending on the particular application's characteristics." *See* '262 patent, 5:55–6:10. To optimize usage of resources on a host, "operations profiles of [applications with dissimilar resource usage] may be suitable to match, because the applications together may be well utilizing different resource components 130 at a host 120." *Id.*; *see also id.* at 4:65–5:13, Fig. 3 (showing comparison of resource usage by an "Application 1" and "Application 2"). The "operations profile of an application" is therefore a representation of resource usage by an application (as shown in Figure 3) across multiple hosts (because it requires "at least two resource frames").

The prosecution history is not relevant to the construction of "operations profile of an application." NovaCloud cites a claim amendment during prosecution, where the "operations profile of an application" element was added to the independent claims (from preexisting dependent claims) to overcome the prior art. Br. 11 (citing Dkt. 86-05 (Nov. 22, 2017 Amendment to the Claims)). There is nothing in this amendment or elsewhere in the prosecution history

concerning the plain meaning of "operations profile of an application" that conflicts with IBM's construction.

Thus, as with "resource frame of an application" (*supra* § III.B), IBM's construction of "operations profile of an application" clarifies the term's requirements based on the language of the claims. *TQP*, 2012 WL 1940849, at *2; *see RFCyber Corp. v. Google LLC*, No. 2:20-CV-274-JRG, 2021 WL 5357465, at *18 (E.D. Tex. Nov. 17, 2021) (adopting construction to "assist the jury to understand the claims" and rejecting "plain and ordinary meaning construction [as] insufficient"). NovaCloud offers no explanation how IBM's construction deviates from the claim language or otherwise contradicts the intrinsic record. IBM's construction should be adopted.

## IV. THE '348 PATENT

The '348 patent is directed to monitoring and recording data about the use of a network service, particularly in Ethernet transport networks by users who have a Service Level Agreement (or "SLA") that governs their use of the network. '348 patent, 1:18–33, 1:45–46. Claim 1 recites a method of monitoring "a user's usage of a network service" by recording three data values: (1) how long the service was considered "active," (2) the service's "average loading" during that time, and (3) how long the service was considered "saturated." *Id.* at 9:18–28. The first and third values are recorded "relative to" a "predefined activity threshold value" and a "predefined saturation threshold value," respectively. *Id.* Independent claim 10 recites a "service usage indicator" with an "input configured to receive" those threshold values and a "data collector configured to record" the same three data values. *Id.* at 10:9–22. Every asserted claim shares these limitations.

IBM's motion to dismiss as to the '348 patent under 35 U.S.C. § 101 (Dkt. 48) is fully briefed and pending; if granted, it will moot these disputes.[4] NovaCloud's positions here confirm the claims are ineligible. In opposing IBM's Section 101 challenge, NovaCloud defended the claims by invoking the specification's supposedly memory-efficient scheme, stating it requires implementing "specialized counters" to improve existing systems. *E.g.,* Dkt. 49 at 1–2, 8–10. Now, however, it insists the claims are not so limited, arguing that the claims "place no restriction on what form the activity threshold value must take" (Br. 12–13); "the units in which a value is reported are a matter of implementation, not of claim scope" (*id.* at 14); and "loading" is merely "the burden or use placed on the network service" (*id.*). If the claims are truly that unbounded, then the features NovaCloud told the Court were inventive are unclaimed, and "features that are not claimed are irrelevant" to eligibility. *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1293 (Fed. Cir. 2020). On NovaCloud's own reading, the claims recite exactly what IBM's motion said: monitoring and recording data relative to other data, in any form, by any means. Dkt. 48 at 5–14.

**A. Applicable Law on Coined Terms in a Claim**

All three claim terms at issue for the '348 patent—"activity threshold value," "loading," and "saturation threshold value"—are coined by the patentee. The Federal Circuit has explained that "terms coined by the inventor are best understood by reference to the specification." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1321 (Fed. Cir. 2013). Ordinarily, coined

[4] IBM responds to NovaCloud's constructions without prejudice to that motion. For purposes of IBM's motion to dismiss, the parties agreed that claim construction is not necessary to resolve the patent-eligibility question. Dkt. 48 at 14. Under either party's proposal, the claims are directed to monitoring and recording data relative to other data. IBM's constructions fix the units of the data recorded, while NovaCloud's proposal leaves the data undefined; either way, confining abstract data collection to a particular type or set of data is insufficient for an inventive concept. *See BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1290–91 (Fed. Cir. 2018).

terms "cannot be construed broader than the disclosure in the specification." *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357 (Fed. Cir. 2016); *see also Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) ("[A]bsent such an accepted meaning, we construe a claim term only as broadly as provided for by the patent itself."); *Fractus S.A. v. ZTE Corp.,* 2018 WL 4282783, at *7 (E.D. Tex. Sept. 7, 2018) (stating that where parties agreed term "was coined by the patentees," the term should be understood by referring to specification).

**B. "activity threshold value" (Claims 1–3, 5–15, 17)**

| IBM's Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Threshold number of packets that is used to determine if a service is deemed active or inactive. | No construction necessary. |

NovaCloud does not dispute that "activity threshold value" is a coined term. Here, IBM's construction is the patent specification's definition of that coined term. *3M*, 725 F.3d at 1321 ("[T]erms coined by the inventor are best understood by reference to the specification."). NovaCloud does not dispute that the "activity threshold value" is "used to determine if a service is deemed active or inactive." It disputes only whether the "value" in "activity threshold value" is a threshold "number of packets."

The specification states "[t]he activity threshold *is* measured in numbers of packets and is used to filter out packets that are used by the operator to manage the service . . . ." '348 patent, 5:9–12 (emphasis added). That is quintessential lexicography. *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (explaining that the word "is" "may 'signify that a patentee is serving as its own lexicographer'" (citation omitted)); *Sol IP, LLC v. AT&T Mobility LLC*, 2019 WL 6878836, at *15 (E.D. Tex. Dec. 16, 2019) (holding that a disclosure which "begins by stating what a [term] 'is'" "weighs in favor of finding a lexicography"); *Widevine Techs., Inc. v. Verimatrix, Inc.*, No. 2:07-CV-321, 2009 WL 3734106, at *7 (E.D. Tex. Nov. 4,

2009) (adopting as the construction of "payload" the specification's sentence stating what a payload "is"). The specification elsewhere consistently uses the same value (*i.e.*, packets) for the "activity threshold," as it states that: the threshold "is typically set to the average *number of* management *packets*" transported per sampling period; the activity count increments only when "the *number of packets* monitored" meets the threshold; and, in operation, "[t]he *number of packets* received in each second is compared to the *activity threshold* and if greater than or equal to this value an active second is declared." '348 patent, 5:12–18, 6:40–42 (emphases added). Thus, because "the ['348 patent] specification explains and defines [this] term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998).

In addition, measuring the activity threshold by number of packets is how the invention performs the packet-filtering function NovaCloud emphasizes in its brief. According to NovaCloud, the prior art "could not selectively filter out *packets* corresponding to operator or management traffic," and the patent solved that problem with "an activity threshold that is used to filter out *packets* that are used by the operator to manage the service." Br. 4 (emphases added). As discussed above, the specification likewise makes clear that the activity threshold is "measured in numbers of packets," which is typically set to the average number of management *packets* expected per sampling period. '348 patent, 5:9–18. Thus, because the patent identifies management traffic by measuring packets, measuring an activity threshold value using some other unit could not distinguish user traffic from management traffic—which is precisely the function NovaCloud asserts defines the invention. As discussed below, NovaCloud identifies no other measurement unit contemplated in the specification.

Furthermore, NovaCloud is wrong in asserting that "other embodiments describe the 'activity threshold' broadly." Br. 13. There are no other embodiments. As discussed, the patent discloses a detailed embodiment of the activity threshold measured by number of packets. '348 patent, 4:18–20, 4:31–33. NovaCloud's three cited passages (Br. 13 (citing '348 patent, 2:32–34, 3:18–21, 5:7–9)) do not describe measuring that threshold with a value other than packets. Two of those cited passages are statements about the threshold's purpose: determining whether the service "is . . . active" ('348 patent, 2:32–34), and ensuring that "network management traffic is ignored" (*id.* at 3:18–21). The third passage merely explains how the activity threshold is defined ("by the operator"). *Id.* at 5:7–9. Thus, NovaCloud identifies nothing in the patent that is inconsistent with an activity threshold value that is measured in packet numbers. *See Sol IP*, 2019 WL 6878836, at *15–16 (noting plaintiff "was unable to cite any disclosure in the specification as purportedly being inconsistent with Defendants' proposal," which was consistent with patent's definitional statement).

Finally, NovaCloud argues that (1) a skilled artisan "would understand that the 'activity threshold value' could be expressed in different ways," and (2) IBM has shown neither lexicography nor disavowal. Br. 13. NovaCloud's first assertion is both entirely unsupported and also misunderstands the inquiry. The question here is not how a skilled artisan might design a threshold to be "expressed" in the abstract; instead, it is how *the '348 patent* defines this coined term. *See Irdeto*, 383 F.3d at 1300; *Indacon*, 824 F.3d at 1357. NovaCloud's second assertion is wrong. To start, as detailed above, the patentee acted as its own lexicographer and provided an express definition of "activity threshold value" in the specification. *Supra* at pp. 13–14; *Sinorgchem*, 511 F.3d at 1136. IBM also does not rely on disavowal. NovaCloud's cited cases—*Thorner* and *Liebel-Flarsheim*—only prohibit narrowing of a term to a preferred embodiment

"absent a clear indication in the intrinsic record." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004); *id.* at 905–06 (disputed term "opening" had an ordinary meaning that the patent did nothing to redefine). The patentee's express definition of "activity threshold value" is such an indication: "[t]he inventor's written description of the invention . . . is relevant and controlling insofar as it provides clear lexicography." *Thorner*, 669 F.3d at 1366 (citation omitted). IBM's construction "only holds the patentee to the explicit definition provided in the . . . specification," and thus should be adopted. *Cell & Network Selection LLC v. AT&T Inc.*, 2014 WL 3671029, at *2, *7 (E.D. Tex. July 23, 2014).

**C. "loading" (Claims 1–3, 5–15, 17)**

| IBM's Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Percentage of the bandwidth of the service used against that which is actually available. | No construction necessary. |

IBM's construction of "loading" is taken from the specification. "Loading" is not a term of art; it is a term that the patentee coined. As described below, the specification makes clear that "loading" is what the specification describes as "raw utilisation," which is "a *percentage of the bandwidth of the service used against that which is actually available* each sampling period." '348 patent, 5:27–29 (emphasis added). The term "loading" appears in the claim phrase "recording an average loading of the network service." *Id.* at 9:23–25; 10:17–19. As NovaCloud agrees (Br. 14), the patent equates the recited "average loading" with a "utilisation statistic." '348 patent, 5:25–27 ("The utilisation statistic represents the average loading during the time that the service was considered active over the recording period."); *id.* at 2:35–37. As NovaCloud also agrees (Br. 14), the "utilisation statistic" is computed by "measuring a raw utilisation of the service each sampling period, which is then averaged on an ongoing basis over the recording period." *Id.* at 5:22–24. Thus, the specification defines "average loading" as the average raw utilisation and

equates "loading" with raw utilisation—which, as discussed above, is the "percentage of the bandwidth of the service used against that which is actually available." *Id.* at 5:27–29. That is IBM's construction.

NovaCloud responds with three arguments. All of them fail. *First*, NovaCloud contends the claims do not recite any particular reporting unit for "loading," such as percentages or bandwidth, so the claims should not be limited to one and are somehow broader. Br. 14. As explained above, however, the specification shows that "loading" is a percentage of the bandwidth of the service used against that which is actually available. Indeed, even NovaCloud admits that "raw utilisation" is "expressed as a percentage." *Id*. Nor does NovaCloud identify any disclosure in the specification referring to "raw utilisation" as anything other than a percentage. '348 patent, 5:27–29 (definition of "raw utilisation"); 5:54–56 (description of Figure 2); 7:8–11 (Equation 1); 8:29–34 (Figure 3); 8:42–50 (Table 1); 8:51–9:6 (Figure 4). Thus, because "loading" is a coined term, it cannot be "construed broader than th[is] disclosure in the specification." *Indacon*, 824 F.3d at 1357. NovaCloud nevertheless seeks a broader definition. But it offers no basis in the specification for a broader understanding than what is articulated in IBM's construction.

*Second*, NovaCloud argues that IBM "conflate[s] 'average loading' with 'raw utilisation'" and, citing a sentence in the patent's Summary section ('348 patent, 2:35–37), it contends that "other embodiments describe a utilisation statistic broadly and without reference to any units." Br. 14. As an initial matter, NovaCloud misunderstands IBM's construction: IBM does not seek to construe "average loading" or the "utilisation statistic." As explained above, IBM's construction of "loading" relies on the specification's treatment of it as "raw utilisation." In any event, NovaCloud's reference to the sentence in the patent's Summary section does not change the understanding of the claimed "loading" or point to any other supposed "embodiments." Br. 14

(citing ’348 patent, 2:35–37). Indeed, that sentence never suggests “loading” is measured in a unit other than percentage of bandwidth. Nor does that sentence—or anywhere else in the patent—define “loading” (much less “raw utilisation” or even “utilisation statistic”) as being measured by a different unit. NovaCloud’s cited cases do not apply because they only prohibit narrowing of a term to a preferred embodiment absent a clear indication in the intrinsic record. *Supra* at pp. 15–16. Here, as discussed, there is such a clear indication, and IBM’s construction defines “loading” in the only way disclosed in the patent.

*Finally*, NovaCloud argues that “loading” means only “the burden or use placed on the network service,” and that “the units in which a value is reported are a matter of implementation, not of claim scope.” Br. 14. NovaCloud’s only purported support is the Background’s description of known SLA parameters. *Id.* (citing ’348 patent, 1:30–46). But those SLA parameters are not “loading.” They describe the service terms the user negotiated in its SLA, whereas the recorded data values in the claimed method, including “loading,” indicate whether the user is *complying* with its SLA. ’348 patent, 1:30–46, 2:3–18, 9:6–15; Br. 4 (separately discussing the SLA parameters and the “data values representative of the user’s service usage” collected by the patent). Thus, the SLA parameters are separate from “loading” and do not impact the term’s definition. NovaCloud’s argument therefore should be ignored.

**D. “saturation threshold value” (Claims 1–3, 5–15, 17)**

| IBM’s Proposed Construction | Plaintiff’s Proposed Construction |
|---|---|
| Percentage representing the loading at which the operator considers the service saturated. | No construction necessary. |

“Saturation threshold value” is another coined term. The specification defines the term by stating that “[t]he saturation threshold is a percentage and represents the raw utilisation at which the operator considers the service saturated.” ’348 patent, 5:32–34. IBM’s construction adopts

that definition verbatim, except that it substitutes "raw utilisation" with "loading." As described above, "loading" is "raw utilisation," so IBM's substitution does not change the substance. It merely uses language that the claim uses (*i.e.*, "loading"), so the jury is not asked to apply a term—"raw utilisation"—that does not appear in the claims and would itself require construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms, as construed by the court, must ensure that the jury fully understands the court's claim construction rulings . . . .").

The specification consistently refers to the saturation threshold value as a percentage. The specification explains that each sampling period, "[t]he raw utilisation is compared to the saturation threshold and if it is greater than or equal to this value then a saturated second is declared." '348 patent, 6:42–44. The specification undoubtedly refers to the raw utilisation as a percentage (*id.* at 5:27–29), which NovaCloud concedes (Br. 14). The patent's figures also consistently depict the saturation threshold as a percentage. *See* '348 patent, 8:26–34 & Fig. 3 (showing saturation threshold (11) as a horizontal line on a graph where the Y-axis is 0 to 100%); *id*. at 8:65–9:5 & Fig. 4 (showing saturation threshold (11) as a horizontal line on a graph where the Y-axis is 0 to 100%).

NovaCloud's citations to the specification do not support its argument. For instance, it cites statements from the Summary section of the patent at 2:40–42 and 3:21–23. Br. 15–16. But neither discloses a value for saturation threshold. Instead, they merely state how the saturation *count* (a different data value) is determined using the saturation threshold value (2:40–42) and what the threshold is *for* (3:21–23). These types of general statements of function "cannot override the express definitional language" of a term. *Sinorgchem*, 511 F.3d at 1138. Additionally, NovaCloud cites references in the Background section of the patent to "Mbits/s" at 1:34–38. Br.

16. But those references relate to the SLA's parameters, not the threshold to which raw utilisation is compared. '348 patent, 1:30–38. If anything, they support IBM's construction: the patentee knew how to state a bandwidth figure in Mbits/s and chose instead to define the saturation threshold as a percentage of that capacity. '348 patent, 5:32–34. Further, NovaCloud asserts that Figure 2 "does not define the saturation threshold as a percentage," based on a statement in the patent's Brief Description of the Drawings. Br. 16 (citing '348 patent, 4:23–24). But the patent's discussion of the figure in its Detailed Description section supports IBM's construction, as it describes Figure 2 as "a graph of raw utilisation [(or loading)] (*as a percentage*) versus time" on which "[t]he saturation threshold is marked as a dashed line (11)." '348 patent, 5:54–56. Thus, NovaCloud's cited specification passages either say nothing about how the threshold value is expressed or only further confirm that the threshold value is a percentage. NovaCloud's reliance on *Thorner* and *Liebel-Flarsheim*, and its observation that IBM has not shown lexicography or disavowal, also miss the point in the same way they do for "activity threshold value" because the specification expressly defines "saturation threshold value." Br. 16; *supra* at pp. 15–16.

Finally, NovaCloud contends IBM's construction "improperly injects a human element" because it describes the percentage as the loading "at which the operator considers the service saturated." Br. 16. But the reference to the "operator" is taken directly from the specification. '348 patent, 5:33–34. That "operator" identifies the source of the saturation threshold value, which is predefined, not a human mental step performed while the method runs. *Id.* The claims require the threshold to be "predefined" (claim 1) and received as an "input" (claim 10): the operator sets a percentage before monitoring begins, and every claimed step is thereafter an objective, mechanical comparison against that preset value. Indeed, NovaCloud agrees that the patent's purpose is to determine "whether a user has complied with a network *operator* service level

agreement." Br. 3 (emphasis added). NovaCloud's assertion about IBM's construction injecting a "human element" therefore is entirely misplaced and should be rejected.

## V. THE '480 PATENT

The '480 patent focuses on "configuring and monitoring a virtual application in a cloud environment." '480 patent, 1:14–16. The patent describes using one or more virtual machines ("VMs") to create cloud-based virtual applications. *Id.* at 1:20–27. The key purported invention of the patent is the "injection VM," a virtual machine that is deployed as part of the virtual application and configures and monitors that virtual application. *Id.* at 5:22–39. The claimed method involves generating instructions to configure the virtual application and adding those instructions to an injection VM image, then modifying the application deployment descriptor so the injection VM can be deployed with the application. *Id.* at 2:5–21. Claim 1 is an independent claim, upon which Asserted Claims 2–7 further depend.

### A. "modifying an injection virtual machine (VM) image"

| IBM's Proposal | Plaintiff's Proposal |
|---|---|
| No correction necessary. | *Change* "<u>modifying an injection virtual machine (VM) image</u> to include injection data, wherein the virtual application VM image is a template for instantiating a virtual application VM that implements the virtual application . . . ." *to* "<u>modifying a virtual application VM image</u> to include injection data, wherein the virtual application VM image is a template for instantiating a virtual application VM that implements the virtual application . . . ." |

As NovaCloud concedes, the '480 patent issued with several errors across multiple claims. These errors were so pervasive that after the initiation of this suit, NovaCloud sought a certificate of correction from the USPTO. *See* Certificate of Correction (Dkt. 86-08). NovaCloud agrees that the certificate of correction has no retroactive effect. *See* Br. 5; *Novo Indus., L.P. v.*

*Micro Molds Corp.*, 350 F.3d 1348, 1356 (Fed. Cir. 2003) ("[A] certificate of correction is only effective for causes of action arising after it was issued."). Yet, NovaCloud now attempts to obtain a retroactive judicial correction for one of these errors, impacting the third limitation of Claim 1. Br. 5. For the reasons explained below, that request should be denied.

The standard for judicial correction of a claim via claim construction is "a demanding one" that must be "rigorously applied." *Canatex Completion Sols., Inc. v. Wellmatics, LLC*, 159 F.4th 39, 46 (Fed. Cir. 2025). It applies only in the rare circumstance that all the following elements are met: (1) the error must be "evident from the face of the patent," and "obvious . . . from the point of view of one skilled in the art"; (2) "the correction is not subject to reasonable debate based on consideration of the claim language and the specification"; (3) "the prosecution history does not suggest a different interpretation of the claims"; and (4) the error to be corrected is an "obvious minor typographical [or] clerical error[]." *Canatex*, 159 F.4th at 46. The Federal Circuit has clarified that changes to claim language that "result in a claim scope different from the one that relevant readers would understand" are the province of the PTO. *Id.* By contrast, a judicial correction may be used only to correct obvious, minor errors, to give the claim "the meaning the claim always had." *Id.*

**1. The Error Is Not Minor or Obvious on the Patent's Face**

A district court may correct only "minor typographical and clerical errors," whereas "major errors are subject only to correction by the PTO." *Novo*, 350 F.3d at 1357. Errors that have been previously found "minor" and correctable include, for example, correcting "second part" to "first part" where there was no antecedent "first" in the original claim (*Canatex*, 159 F.4th at 46); adding a missing comma in a chemical formula (changing "f cl" to "f, cl") (*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1352 (Fed. Cir. 2009)); and adding "and" to a garbled phrase that read "detect analyze" rather than "detect and analyze" (*CBT Flint Partners, LLC v.*

*Return Path, Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011)). Correction of the minor typographical errors in these cases was justified, as the corrections simply gave the patents the "meaning the claim[s] always had," because the errors were obvious and the corrections were beyond reasonable debate. *Canatex*, 159 F.4th at 46.

NovaCloud asks the Court to change "modifying an injection virtual machine (VM) image" to "modifying a virtual application VM image." But this is not a "minor" or "typographical" correction. It is of a different scale and materiality than the judicial corrections that the Federal Circuit has previously approved, such as replacing a mistaken reference to a "second" part with "first," as in *Canatex*. An injection VM image, as defined by the patent, is a "template for instantiating an injection VM." '480 patent, 3:36. A virtual application VM image is a "template for instantiating a virtual application VM." *Id.* at 7:6–7. These are two different virtual machine features with different functionalities. Changing one term for the other would substantively change the meaning and scope of the claims. Such a change is not "simple and 'minor' as a textual matter," and therefore is not appropriate for judicial correction. *Canatex*, 159 F.4th at 46.

In addition, the purported error is not immediately obvious from the face of the patent—from the perspective of a skilled artisan or otherwise. There is no obviously missing conjunction (as in *CBT Flint*) or missing punctuation (as in *Ultimax*). The phrase "reads coherently" on its face; indeed, it has no clearly missing language and it is not apparent that a specific phrase should be substituted in. *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1333 (Fed. Cir. 2014); *Grp. One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1303 (Fed. Cir. 2005) ("one cannot discern what language is missing simply by reading the patent").

Nevertheless, NovaCloud argues that the error is obvious because the following "wherein" clause refers to "the virtual application VM image," which is not introduced earlier in the claim. at 18. But even if "the virtual application VM image" has no antecedent, it would not be clear to

a skilled artisan that the error lies in the antecedent phrase "injection virtual machine (VM) image." For example, the latter, unsupported reference to "the virtual application VM image" could contain an error; the phrase could have been intended to read "*a* virtual application VM image" or perhaps could be a different phrase altogether. In short, the lack of antecedent basis does not make clear which clause of the claim contains an error. NovaCloud also argues that the error is obvious because the third limitation at issue "duplicates the subject of the preceding limitation." Br. 18. But multiple successive limitations can involve the same subject, so there is no reason (nor does NovaCloud provide one) that the duplication of the subject would obviously signal an error. In any event, even if a claim as written is "nonsensical," this does not mean a court may freely rewrite it. *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1366–67 (Fed. Cir. 2021).

Furthermore, that the '480 patent was left uncorrected for over five years after the patent issued indicates that the errors were not obvious from the face of the patent. *See* Certificate of Correction, Dkt. 86-08. Indeed, NovaCloud does not appear to have detected the error until after it initiated this lawsuit, which indicates that in all its diligence when acquiring the patent from the original patent owner, NovaCloud also failed to find this error. The delay in seeking correction—first by the original patent owner, Ericsson, and later by NovaCloud—weighs against any finding that the error was obvious on the patent's face. *Levitation Arts, Inc. v. Fascinations Toys & Gifts, Inc.*, No. A-07-CA-990-SS, 2008 WL 11334126, at *3 (W.D. Tex. Apr. 15, 2008) (finding that delay in seeking correction weighed against judicial correction).

**2. The Correction Is Subject to Reasonable Debate**

Even if a skilled artisan identified an error in the third claim limitation, they would not necessarily know what should be substituted in place of "injection virtual machine (VM) image." NovaCloud argues that the specification would indicate to the skilled artisan "beyond reasonable debate" that the proper correction is "modifying a virtual application VM image." Br. 18–19. But

a correction is "not subject to reasonable debate only where the specification makes one correction clearly correct." *STMicroelectronics, Inc. v. Motorola, Inc.*, 327 F. Supp. 2d 687, 702 (E.D. Tex. 2004).

Here, the specification does not indicate that "modifying a virtual application VM image" is the only reasonable correction to the third claim limitation, and indeed describes it as just one exemplary or "optional" embodiment. Where the specification indicates a claim limitation is "optional," it "negates any argument that such a limitation in the claim is implied as necessary to the invention." *H-W Tech.*, 758 F.3d at 1334.

That is the scenario here. The '480 patent specification identifies "modifying a virtual application VM image" as simply one exemplary "embodiment." '480 patent, 7:5–14; *see also id.* at 8:44–46, 8:63–66 (identifying modification of virtual application VM images as an "[e]xemplary operation[]"); *id.* at 9:58–60 ("In one embodiment, one or more of the virtual application VM images 330 is modified to include injection data 340."); *id.* at 10:58–60 ("In one embodiment, the computing device 100 modifies a virtual application VM image to include injection data."). Therefore, it is not clear that "modifying a virtual application VM image" is the only proper substitute for "modifying a VM injection image," as the specification leaves room for other embodiments.

Contrary to NovaCloud's representations, the patent's figures also identify the "modifying a virtual application VM image" step as "optional." *Id.* at 4:7–13. The patent states that "blocks with dashed borders" in figures "illustrate optional operations that add additional features to certain embodiments." *Id.* In Figure 5, "[m]odify a virtual application VM image to include injection data" is the only step in a block with dashed borders.

Thus, the claim language and specification support that the correction is subject to reasonable debate, even to a skilled artisan. There is no "consistent[] and exclusive[]" depiction

of "virtual application VM image" as the only proper way to read the third limitation of Claim 1. Br. 19. The ambiguous specification therefore cannot satisfy the "demanding" standards for judicial correction.

### 3. The Prosecution History Is Not Dispositive in Light of the Other Factors

NovaCloud contends the prosecution history supports its proposed correction because it shows that when the claims were originally allowed, claim 1's third limitation recited "modifying a virtual application VM image." *See* Br. 19–20; Dkt. 86-10. NovaCloud argues that this shows the version of claim 1's third limitation in the published patent was therefore printed in error. But "evidence of error in the prosecution history *alone* [is] insufficient to allow the district court to correct the error." *H-W Tech.*, 758 F.3d at 1334 (emphasis added). As explained above, because in this case "one cannot discern what language is missing simply by reading the patent," "[t]he district court does not have authority to correct the patent in such circumstances." *Grp. One*, 407 F.3d at 1303; *supra* § V.A. NovaCloud's attempted reliance on the prosecution history alone therefore does not overcome the problems discussed above with respect to the other factors.

## VI. CONCLUSION

IBM respectfully requests that the Court adopt IBM's constructions and deny NovaCloud's request for retroactive judicial correction of claim 1 of the '480 patent.

Dated: September 11, 2026

*/s/ Brian A. Rosenthal*

Brian A. Rosenthal
Laura Corbin (*pro hac vice*)
Charles M. Sim
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035
Email: brosenthal@gibsondunn.com
Email: lcorbin@gibsondunn.com
Email: csim@gibsondunn.com

Mark Reiter
**GIBSON, DUNN & CRUTCHER LLP**
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3360
Facsimile: 214.571.2900
Email: mreiter@gibsondunn.com

Jaysen S. Chung
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200
Facsimile: 415.393.8306
Email: jschung@gibsondunn.com

Hannah L. Bedard (*pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
1700 M Street, NW
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.831.6106
Email: hbedard@gibsondunn.com

Melissa Smith
**GILLAM & SMITH LLP**
303 S. Washington Ave.
Marshall, Texas 75670
Telephone: 903.934.8450
Facsimile: 903.934.9257
Email: melissa@gillamsmithlaw.com

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record are being served with a copy of the foregoing publicly filed documents via the Court's CM/ECF system on September 11, 2026.

/s/ *Brian A. Rosenthal*
Brian A. Rosenthal