**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **NOVACLOUD LICENSING, LLC,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**INTERNATIONAL BUSINESS MACHINES CORP.,**<br><br>**Defendant.** | **Civil Action No. 2:25-cv-00700**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF NOVACLOUD LICENSING, LLC'S**
**REPLY CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**


I. The ’262 Patent ..... 1

A. “host” (claims 1-17) ..... 1

B. “resource frame of an application” (claims 1-17) ..... 3

C. “operations profile of an application” (claims 1-17) ..... 4

II. The ’348 Patent ..... 5

A. “activity threshold value” (claims 1-3, 5-15, 17) ..... 5

B. “loading” (claims 1-3, 5-15, 17) ..... 6

C. “saturation threshold value” (claims 1-3, 5-15, 17) ..... 8

III. The ’480 Patent ..... 9

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Becton Dickinson & Co. v. C.R. Bard Inc.*,
922 F.2d 792 (Fed. Cir. 1990)....................3, 4

*Broadcom Corp. v. Emulex Corp.*,
732 F.3d 1325 (Fed. Cir. 2013)....................2, 5

*Canatex Completion Sols., Inc. v. Wellmatics, LLC*,
159 F.4th 39 (Fed. Cir. 2025) ....................9, 10

*Creative Integrated Systs., Inc. v. Nintendo of Am., Inc.*,
526 Fed. Appx. 927 (Fed. Cir. 2013)....................1

*H-W Tech., L.C., v. Overstock.com, Inc.*,
758 F.3d 1329 (Fed. Cir. 2014)....................10

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014)....................5

*Indacon, Inc. v. Facebook, Inc.*,
824 F.3d 1352 (Fed. Cir. 2016)....................5

*K-2 Corp. v. Salomon S.A.*,
191 F.3d 1356 (Fed. Cir. 1999)....................3, 4

*Lab. Corp. of Am. Holdings v. Qiagen Scis., LLC*,
148 F.4th 1350 (Fed. Cir. 2025) ....................2

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004)....................1, 5, 6, 8

*Nanoco Technologies Ltd. v. Samsung Elecs. Co.*,
No. 2:20-CV-00038-JRG, Dkt. 84 (E.D. Tex. May 11, 2021) ....................1

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc).................... *passim*

*Prima Tek, LLC v. Polypap, S.A.R.L.*,
318 F.3d 1143 (Fed. Cir. 2003)....................1, 2

*Renishaw PLC v. Marposs Societa' per Azioni*
158 F.3d 1243 (Fed. Cir. 1998)....................1, 6

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
511 F.3d 1132 (Fed. Cir. 2007)....................................................................................1, 6

## TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION | DKT. NO. |
|---|---|---|
| A | U.S. Patent No. 9,900,262 | 86-1 |
| B | U.S. Patent No. 8,407,348 | 86-2 |
| C | P.R. 4-3 Disclosures, Ex. A, Dkt. 81-1 | 86-3 |
| D | ’262 Patent – PCT/SE2013/051228 | 86-4 |
| E | ’262 Patent – Amendment to the Claims, November 22, 2017 | 86-5 |
| F | ’262 Patent – Notice of Allowance, January 4, 2018 | 86-6 |
| G | Microsoft Computer Dictionary (5th ed., 2002) | 86-7 |
| H | Certificate of Correction to U.S. Patent No. 10,691,480 dated September 30, 2025 | 86-8 |
| I | U.S. Patent No. 10,691,480 | 86-9 |
| J | Listing of the Allowed Claims for U.S. Patent No. 10,691,480 | 86-10 |
| K | Ex. 1 to IBM’s Responsive Claim Construction Brief | 91-1 |

## TABLE OF ABBREVIATIONS

| TERM | MEANING |
|---|---|
| NovaCloud | Plaintiff NovaCloud Licensing, LLC |
| IBM | Defendant International Business Machines Corporation |
| ’262 Patent | U.S. Patent No. 9,900,262 |
| ’348 Patent | U.S. Patent No. 8,407,348 |
| ’480 Patent | U.S. Patent No. 10,691,480 |
| Br. | NovaCloud’s Opening Claim Construction Brief, Dkt. 86 |
| Resp. | IBM’s Responsive Claim Construction Brief, Dkt. 91 |

## I. The '262 Patent

### A. "host" (claims 1-17)

IBM repackages a preferred-embodiment limitation as "lexicography" by relying on a single sentence: "[a] single physical machine including all its software *may sometimes* be denoted a host." '262 Patent at 1:44-45 (emphasis added); *see* Resp. at 3-6. But "may sometimes" is merely a conditional usage identifying *one* embodiment, *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004), and falls short of a definition stated "with reasonable clarity, deliberateness, and precision." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). At no point did the patentee act as his own lexicographer. *Compare* '262 Patent at 1:44-45, *with Sinorgchem Co., Shandong v. Int'l Trade Comm'n,* 511 F.3d 1132, 1136 (Fed. Cir. 2007) (the word "is" "may signify" lexicography) *and* Ex. K, *Nanoco Technologies Ltd. v. Samsung Elecs. Co.,* No. 2:20-CV-00038-JRG, Dkt. 84 at 7, 12–14 (E.D. Tex. May 11, 2021) (quotation marks and "should be understood herein to relate to" are indicators of lexicography).[1]

IBM's reliance on Figures 1, 6, and 7b fares no better. Depicting hardware components in illustrative figures does not establish a definitional restriction. *Prima Tek, LLC v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1148 (Fed. Cir. 2003) ("[T]he mere fact that the patent drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration."); *see also Creative Integrated Systs., Inc. v. Nintendo of Am., Inc.*, 526 Fed. Appx. 927, 933 (Fed. Cir. 2013). Importing limitations from embodiments is improper "absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-*

[1] IBM applies two different standards for lexicography across different patents. *Compare* Resp. at 6, *with* Resp. at 13. IBM cannot simultaneously argue that "is" is definitional and that "may sometimes be denoted" is equally definitional.

*Flarsheim*, 358 F.3d at 913. There is no such indication here.[2] IBM's reliance on Figures 1, 6, and 7b ignores what the intrinsic record describes: virtual machines can act as hosts to applications. *E.g.,* '262 Patent at 1:27-32, Fig. 1 (to which IBM itself cites in Ex. C and its Resp.); '262 Patent at 5:66-67 ("applications…operated on different virtual machines"). IBM's proposed construction excludes virtual machines acting as hosts from the scope of the claims, which "is rarely, if ever, correct." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013).

The remainder of the intrinsic record confirms that "host" is not limited to physical machines. *First,* the specification uses "*physical* host" when referring to physical hardware, '262 Patent at 5:14–18 (emphasis added)—if "host" invariably meant a physical machine, "physical" would be superfluous. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) ("[T]he claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel."); *see also Lab. Corp. of Am. Holdings v. Qiagen Scis., LLC,* 148 F.4th 1350, 1358 (Fed. Cir. 2025). *Second,* the specification defines hosts functionally—code "run on a host, caus[ing] the host to behave as a host," '262 Patent at 3:1-4—by reference to code executed, not physical hardware. *Third*, the '262 Patent arises in the context of *virtualized* computing: the intrinsic record teaches that "*virtualizing* the hardware" is increasingly common, *id.* at 1:20-22 (emphasis added), that "hosts may be arranged in different ways,"[3] *id.* 4:47-48, that virtual machines may "replace the physical hardware seen from the application or operating system perspective," *id.* at 1:29-30; Ex. D. ¶ 0003, and that "applications [can] potentially be operated on different virtual machines." '262 Patent at 5:66-67; Ex. D. ¶

[2] NovaCloud does not dispute that in the depicted embodiments, hosts contain virtual machines. But that architectural hierarchy does not mean "host" is *limited to* physical hardware. *Prima Tek, LLC*, 318 F.3d at 1148. The claims never recite "physical host" or "physical machine."

[3] IBM conflates quantity with arrangement. Resp. at 5, n.2. The patentee did not claim that a host may be "one or more in number"—it claimed that "hosts may be arranged in different ways."

00041. IBM concedes these references discuss virtual machines, Resp. at 5, but asserts this merely confirms virtual machines are "distinct from" hosts. *Id.* But IBM is wrong: the intrinsic record distinguishes physical hardware from virtual machines—not hosts—and IBM's own citations confirm as much. *See, e.g.,* '262 Patent at 1:20-22, 26-45; *see also* Ex. D ¶¶ 0003, 00031, 0041. And in any event, the claims do not limit "host" to physical hardware. The intrinsic record confirms this, describing how virtual machines "replace the physical hardware." '262 Patent at 1:29-30; Ex. D ¶ 0003.

The Court should reject IBM's proposed construction and give "host" its plain and ordinary meaning.

**B. "resource frame of an application" (claims 1-17)**

IBM's explanation confirms rather than refutes the plain and ordinary meaning of "resource frame of an application." *First,* IBM claims its "construction consolidates the requirements…directly from the claims." Resp. at 7. But IBM's proposal replaces the patentee's chosen term (i.e., "frame") with the generic term "representation." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999) ("[c]ourts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."); *Becton Dickinson & Co. v. C.R. Bard Inc.*, 922 F.2d 792, 799 n.6 (Fed. Cir. 1990). "Frame" has a well-understood meaning in the art, distinct from "representation" and the intrinsic record provides numerous examples of what constitutes a "frame." *E.g.*, '262 Patent at 2:33-36, 2:58-59, 3:7-9, 3:16-19, 3:41-45, 4:27-34, 4:65-5:4, 6:28-31, 7:37-39, 8:40-44; Ex. D ¶¶ 00033, 00054. IBM's proposed construction is found nowhere in the claims, specification, or prosecution history of the '262 Patent. *Phillips*, 415 F.3d at 1316-17. And IBM's claim-differentiation argument is misplaced—NovaCloud is not seeking to limit "resource frame of an application" but exposing IBM's attempt to redraft the claims.

*Second,* IBM contends that the claims themselves require each resource frame to pertain to "a single host" because the claims recite "transmitting an instruction to measure the metric to each respective host" and "receiving a respective resource frame of the application from each respective host." Resp. at 9. But that each host transmits and receives a resource frame does not mean the resource frame is limited to a single host's resource usage—nothing in the intrinsic record imposes such a requirement. IBM's "single host" addition would inject a structural limitation the patentee never imposed. *K-2 Corp.*, 191 F.3d at 1363; *Becton Dickinson & Co.,* 922 F.2d at 799 n.6.

*Third*, and as a fallback, IBM contends that because "resource frame of an application" is not a well-known term in the art, the jury needs IBM's input to understand it. But "resource frame of an application" is a term of art with a meaning well-known by experts in the field, who are fully capable of explaining it to a jury. In any event, the intrinsic record already resolves any ambiguity IBM claims exists. *See* '262 Patent at 2:58-59, 3:7-9, 3:16-19, 3:41-45, 4:27-34, 4:65-5:4, 6:28-31, 7:37-39, 8:40-44; Ex. D ¶¶ 00033, 00054; Br. at 10; Resp. at 8-9.

The Court should reject IBM's construction and give "resource frame of an application" its plain and ordinary meaning.

**C. "operations profile of an application" (claims 1-17)**

IBM's construction should be rejected because it again rewrites the claims. The claims recite "an operations profile," *see* claims 1, 9, and 17, which IBM rewrites as a "representation." *K-2 Corp.*, 191 F.3d at 1363; *Becton Dickinson & Co.,* 922 F.2d at 799 n.6. That substitution imposes a static gloss onto what the claims make clear is a dynamic construct. *See* claims 1, 9, and 17. Moreover, IBM uses "representation" for both "resource frame" and "operations profile"—collapsing two distinct claim terms into one generic label. And finally, IBM's own passage undermines its construction: the specification states that two resource frames "may originate from the same physical host," '262 Patent at 5:14–18; Resp. at 6, yet a profile formed from those frames

cannot satisfy IBM"s requirement of "a representation of an application's resource usage across *multiple* hosts"—thereby excluding an expressly disclosed embodiment. *Broadcom Corp.*, 732 F.3d at 1333. For these reasons, and those in §I.C. *supra*, the Court should reject IBM's proposed construction and adopt the plain and ordinary meaning of "operations profile of an application."

## II. The '348 Patent

IBM's proposed constructions for the '348 Patent terms share the same fatal defect: each imports a unit (either a percentage or number of packets) from a single embodiment, contrary to *Liebel-Flarsheim*, 358 F.3d at 913. IBM bears the burden to establish that the patentees acted as lexicographers yet offers no evidence—such as expert testimony or technical dictionaries—that these are "coined terms." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). Because IBM has not carried its burden of proving these are coined terms (a fact that NovaCloud does, indeed, dispute), the heightened scrutiny IBM seeks to apply—that coined terms "cannot be construed broader than the disclosure in the specification," *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357 (Fed. Cir. 2016)—does not apply. Accordingly, the claim terms should carry their plain and ordinary meaning. *Phillips*, 415 F.3d at 1316.

Separately, IBM's attempt to use its Section 101 motion as a sword in claim construction (IBM Br. at 11–12) is legally irrelevant and should be disregarded. As IBM concedes, claim construction and patent eligibility are distinct inquiries governed by different legal standards. Dkt. 48 at 14. Furthermore, the Court recently determined the '348 Patent claims "contain a technological improvement and thus are not merely an abstract idea." Dkt. 92 at 9.

### A. "activity threshold value" (claims 1-3, 5-15, 17)

IBM's packet limitation rests on a single embodiment: "The activity threshold is measured in numbers of packets and is used to filter out packets that are used by the operator to manage the service." '348 Patent at 5:9–12. This sentence is a description of a particular embodiment, not a

definitional statement with "reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249. Thus, IBM's claim that *Sinorgchem Co., Shandong*, 511 F.3d at 1136 and similar holdings control is incorrect. So, too, is IBM's claim that "there are no other embodiments" that describe the activity threshold value more broadly. *See, e.g.,*'348 Patent at 2:23-34, 3:18-21, 5:7-9. These broader functional descriptions demonstrate that the patentees understood the activity threshold value as a general concept, not one limited to packets.

The claims also confirm this broader meaning and do not specify any unit of measurement. '348 Patent at 9:21-22. If the patentee intended to limit the threshold to packets, it would have done so. This choice must be given effect. *Phillips*, 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms.").

IBM's "packet-filtering" argument is circular and irrelevant. IBM assumes the activity threshold must be measured in packets and then argues—without any support—that any other unit would not work for packet filtering. Neither the patent nor the claims require the specific packet-filtering functionality and instead require only "recording a length of time that a service in the network was considered active relative to a predefined activity threshold value." '348 Patent at 9:20-22.

A person of ordinary skill in the art would understand that there are multiple ways to determine whether a service is "active"—packet counts being one, with bandwidth utilization, data throughput, connection status, or other metrics being others. IBM's assertion that packets are the only possible measurement unit is precisely the type of embodiment-based restriction that *Liebel-Flarsheim* forbids. 358 F.3d at 913.

**B. "loading" (claims 1-3, 5-15, 17)**

IBM's construction rests on the assumption that "'loading' is 'raw utilisation,'" a term IBM admits does not appear in the claims, Resp. at 17, 19. But the specification does not support this

equivalency. The specification's chain of derivation is clear: "raw utilisation" is measured each sampling period and "then averaged on an ongoing basis over the recording period." '348 Patent at 5:22-24. The result of that averaging is the "utilisation statistic," which "represents the average loading during the time that the service was considered active over the recording period." *Id.* at 5:25-27. Thus, the specification's chain is: raw utilisation (per-sampling-period measurement) → averaged over time → utilisation statistic = average loading. IBM skips the critical averaging step and equates "loading" directly with "raw utilisation," which the specification describes only *represents*—but is not equivalent to—the average loading. IBM's conflation is unsupported by the intrinsic record.

The claims use the broad term "loading" without specifying units. A person of ordinary skill in networking would understand "loading" to mean the burden or utilization placed on a network service, consistent with the ordinary meaning of the term in the field. IBM has not shown—through expert testimony, technical dictionaries, or any other evidence—that a person of ordinary skill would understand "loading" to be a coined term or limited to a percentage.

IBM argues that the SLA parameters (bandwidth in Mbits/s) "are separate from 'loading'" (Resp. at 19) but ignores the fact that the SLA parameters are only relevant and useful if commensurable with the metrics being recorded. IBM later uses the fact that the patentee referenced Mbits/s in the specification to argue that the patentee "knew how to state a bandwidth figure in Mbits/s and chose instead to define the saturation threshold as a percentage." Resp. at 20. IBM cannot have it both ways. The specification's reference to various network metrics—including bandwidth measured in Mbits/s—confirms that "loading" was understood in the art to encompass various measures of network usage, not exclusively percentages.

Moreover, IBM's argument highlights a critical distinction that undermines its own position. The specification describes SLA parameters in absolute terms (Mbits/s), demonstrating that the patentee knew of multiple ways to express network usage. The patentee's choice to use the broad term "loading" in the claims—rather than specifying "percentage of bandwidth"—reflects a deliberate decision to claim broadly. The Court should honor that choice and give "loading" its plain and ordinary meaning.

**C. "saturation threshold value" (claims 1-3, 5-15, 17)**

IBM's construction imports "percentage" from the same embodiment it relies on for the other two terms. For the same reasons discussed above, this embodiment description does not constitute lexicography.

As IBM admits (Resp. at 19, 20) the specification often describes a saturation threshold without limiting it to a percentage. The specification describes the saturation threshold value as a general concept—a predefined value against which usage is measured—without tying it to any particular unit. IBM's figure-based argument fails because figures depicting one embodiment cannot narrow the claims. *Phillips*, 415 F.3d at 1323. That the embodiment depicted uses percentages does not mean the claims require them. If it did, every patent claim would be limited to whatever units appear in the figures—a result the Federal Circuit has squarely rejected. *See Liebel-Flarsheim*, 358 F.3d at 913. Thus, IBM's arguments relying on a disclosed embodiment that uses percentages provide no basis to add a percentage limitation to the claims. *Phillips*, 415 F.3d at 1323 ("the claims of the patent are not limited to the preferred embodiment").

IBM's construction further assumes the saturation threshold value must be "predefined" by a human operator based on their subjective consideration. IBM Br. at 20-21. IBM is incorrect. The claims need only a "predefined saturation threshold value"—a value against which a measurement is objectively compared. How or why the value was chosen, and who or what chose

it, is irrelevant to claim scope. IBM's construction needlessly complicates the jury's task by injecting this subjective element. The Court should reject IBM's proposed construction for "saturation threshold value" and give the term its plain and ordinary meaning.

## III. The '480 Patent

IBM does not dispute that the USPTO made several misprints in issuing the '480 Patent or that the USPTO has acknowledged and corrected these errors in issuing its Certificate of Correction. Resp. at 21-22. Nor does it dispute that the prosecution history supports only NovaCloud's requested correction. *Id.* at 26. Instead, IBM resists retroactive judicial correction by mischaracterizing the nature of the error in Claim 1 and manufacturing "reasonable debate" where none exists. NovaCloud therefore respectfully requests the Court judicially and retroactively correct Claim 1 of the '480 Patent.

*First*, the error in Claim 1 (*i.e.,* modifying an *injection virtual machine (VM) image*, rather than a *virtual application VM image)*, is a minor and obvious clerical error ripe for judicial correction. IBM contends that NovaCloud's requested correction is not "minor" because an injection VM image and a virtual application VM image are "two different virtual machine features with different functionalities." *Id.* at 23. However, this line of argument directly contradicts the Federal Circuit's analogous caselaw in *Canatex*—a case that IBM agrees warranted judicial correction. *Id.* at 22-23. In *Canatex*, the Federal Circuit judicially corrected claims in a patent directed to a device used in oil and gas wells that identified a "first part" and "second part." *Canatex Completion Sols., Inc. v. Wellmatics, LLC*, 159 F.4th 39, 41 (Fed. Cir. 2025) (changing "the connection profile of the *second* part" to "the connection profile of the *first* part"). There, the Federal Circuit held that the correction—replacing one functionally distinct component with another—was "simple and 'minor' as a textual matter." *Id.* at 46. IBM's argument to the contrary is therefore a non-starter.

Similarly, IBM's argument that the error in Claim 1 is not obvious again contradicts the Federal Circuit's holding in *Canatex*. IBM argues that the error in Claim 1 is not obvious because "the lack of antecedent basis does not make clear which clause of the claim contains an error." Resp. at 24. Yet, the Federal Circuit relied on the same lack of an antecedent basis in the claim at issue in *Canatex* to support its holding that the error was obvious. *Canatex*, 159 F.4th at 47 ("the phrase at issue plainly requires an antecedent…but [none] has previously been mentioned in the claim."). Here, much like in *Canatex*, "a relevant reader would immediately see that something was off in [the] language." *Id.*

*Second*, IBM attempts to manufacture debate where there is none. Despite arguing that the correction of the obvious error is subject to reasonable debate, IBM offers no reasonable alternative correction. *See generally* Resp. Instead, IBM's argument centers entirely on the exemplary nature of the embodiments described in the specification. Resp. at 24-26. IBM highlights the optionality of the modification of virtual application VM images as described in the specification and figures of the '480 Patent. Resp. at 24-26. Critically, the optionality of the modification refers to the entire step of modification, not the subject of the modification. *See, e.g.,* Ex. I at 4:7-10, 7:5-14, 9:58-60 and Fig. 5. IBM's reliance on *H-W Tech., L.C., v. Overstock.com, Inc.* to support its argument is misplaced as there an entire optional limitation was omitted from the claim. 758 F.3d 1329, 1333-34 (Fed. Cir. 2014). IBM's failure to offer even a single alternative correction supported by the specification exemplifies the fact that NovaCloud's requested correction is not subject to reasonable debate.

NovaCloud therefore respectfully requests the Court retroactively judicially correct claim 1's third limitation to modify a "virtual application VM image," rather than "an injection virtual machine (VM) image."

Dated: September 18, 2026

*/s/ Jennifer L. Truelove*

Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street, Suite 300
Marshall, Texas 75670
Telephone: (903) 923-9002
Facsimile: (903) 923-9099

Kevin L. Burgess
Texas State Bar No. 24006927
kburgess@bkbclaw.com
**BUDWIN KAMPRATH BURGESS CAMPBELL, PLLC**
508 Oakwood Estates Blvd
Marshall, TX 75672
Telephone: (512) 626-7253

John B. Campbell
Texas State Bar No. 24036314
jcampbell@bkbclaw.com
**BUDWIN KAMPRATH BURGESS CAMPBELL, PLLC**
3600 Wellspring Drive
Austin, Texas 78738
Telephone: (512) 655-3820

Stone A. Martin
Texas State Bar No. 24143713
smartin@McKoolSmith.com
Rania Khamees
Texas State Bar No. 24149673
rkhamees@McKoolSmith.com
**MCKOOL SMITH, P.C.**
303 Colorado Street Suite 2100
Austin, TX 78701
Telephone: (512) 692-8700
Facsimile: (512) 692-8744

Casey L. Shomaker
Texas State Bar No. 24110359
cshomaker@McKoolSmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1200

Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Clara Bourget
California State Bar No. 356959
cbourget@McKoolSmith.com
**MCKOOL SMITH, P.C.**
300 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

Michael E. Catapano
New York State Bar No. 5933700
mcatapano@mckoolsmith.com
Mariel Talmage
New York State Bar No. 5948831
mtalmage@McKoolSmith.com
**MCKOOL SMITH, P.C.**
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

**ATTORNEYS FOR PLAINTIFF NOVACLOUD LICENSING, LLC.**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on September 18, 2026.

*<u>/s/ Jennifer L. Truelove</u>*
Jennifer Truelove