**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| NOVACLOUD LICENSING, LLC,<br>*Plaintiff*,<br>v.<br>INTERNATIONAL BUSINESS MACHINES CORP.,<br>*Defendant*. | §<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 2:25-cv-00700-JRG-RSP |

**<u>CLAIM CONSTRUCTION ORDER</u>**

On September 30, 2026, the Court held a hearing to determine the proper construction of disputed terms in United States Patents No. 8,407,348, 9,900,262, and 10,691,480.

Before the Court are the Opening Claim Construction Brief (Dkt. No. 86) filed by Novacloud Licensing, LLC ("Novacloud"), the Responsive Claim Construction Brief (Dkt. No. 91) filed by Defendant International Business Machines Corp. ("IBM"), and Plaintiff's reply (Dkt. No. 93). Also before the Court is the parties' July 31, 2026 Joint Claim Construction and Prehearing Statement Pursuant to P.R. 4-3 (Dkt. No. 81) and the parties' September 25, 2026 P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 95).

Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing, having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

Table of Contents

**I. BACKGROUND** .......... **2**
**II. LEGAL PRINCIPLES** .......... **4**
**III. AGREED TERMS** .......... **6**
**IV. DISPUTED TERMS IN U.S. PATENT NO. 9,900,262** .......... **7**
A. "host" .......... 7
B. "resource frame of the application" .......... 12
C. "operations profile of an application" .......... 16
**V. DISPUTED TERMS IN U.S. PATENT NO. 8,407,348** .......... **18**
D. "activity threshold value" .......... 18
E. "loading" .......... 22
F. "saturation threshold value" .......... 26
**VI. DISPUTED TERM IN U.S. PATENT NO. 10,691,480** .......... **31**
G. Claim 1 of the '480 Patent .......... 31
**VII. CONCLUSION** .......... **36**
**APPENDIX A** .......... **37**

## I. BACKGROUND

Plaintiff alleges infringement of United States Patent Nos. 8,401,028, 8,407,348 ("the '348 Patent"), 9,225,651, 9,491,063, 9,900,262 ("the '262 Patent"), and 10,691,480 ("the '480 Patent"). Dkt. No. 34, First Amended Complaint ¶¶ 2–7. The parties have claim construction disputes as to the '348 Patent, the '262 Patent, and the '480 Patent. Dkt. No. 90, Exs. A, B & I.

The '348 Patent, titled "Monitoring Network Usage," issued on March 26, 2013, and bears an earliest priority date of February 17, 2006. Plaintiff submits that "[t]he '348 Patent generally relates to monitoring service usage in network communications, describing methods and systems for determining whether a user has complied with a network operator service level agreement (SLA)." Dkt. No. 86 at 3. The Abstract of the '348 Patent states:

> A method of determining whether a user has complied with a service level agreement (SLA) with a network operator, comprising collecting a set of data values representative of the user's service usage and comparing the set of data values to the service level agreement. The data values collected provide the operator

> with sufficient information so that it can determine whether a SLA is being complied with and to plan provision of network services. A method of monitoring a user's usage of a network service and a service usage indicator is also disclosed.

The '262 Patent, titled "Methods, Nodes and Computer Program for Enabling of Resource Component Allocation," issued on February 20, 2018, and bears an earliest priority date of October 23, 2013. Plaintiff submits that "[t]he '262 Patent generally relates to resource management in shared computing environments, describing methods and systems in which a resource manager monitors and enables allocation of resource components across multiple hosts in a communications network." Dkt. No. 86 at 1. The Abstract of the '262 Patent states:

> A method, resource manager, and computer program performed by a resource manager in a communications network connected to at least two hosts for enabling of resource component allocation related to the hosts, comprising determining a metric of a resource component for performance monitoring of an application at the hosts, transmitting an instruction to measure the metric to respective host, receiving a respective resource frame of the application from respective host, [and] determining resource allocation for the application based on the received resource frames.

The '480 Patent, titled "Apparatus and Method for Configuring and Enabling Virtual Applications," issued on June 23, 2020, and bears an earliest priority date of August 30, 2017. The Abstract of the '480 Patent states:

> A method is implemented by a computing device to configure and monitor a virtual application in a cloud environment. The method includes generating instructions for configuring and monitoring the virtual application based on configuration data for the virtual application, modifying an injection virtual machine (VM) image to include the instructions for configuring and monitoring the virtual application, where the injection VM image is a template for instantiating an injection VM that is to configure and monitor the virtual application according to the instructions, modifying a virtual application deployment descriptor for the virtual application to indicate that the injection VM is to be injected into the virtual application, and causing the virtual application, with the injection VM, to be deployed in the cloud environment using the modified virtual application deployment descriptor.

Shortly before the start of the September 30, 2026 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion. Those preliminary constructions are noted below within the discussion for each term.

## II. LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841 (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in

the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998)

(quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

## III. AGREED TERMS

In their July 31, 2026 Joint Claim Construction and Prehearing Statement (Dkt. No. 81) and in their September 25, 2026 P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 95), the

parties submitted agreed-upon constructions. Those agreements are set forth in Appendix A of this Claim Construction Order.

## IV. DISPUTED TERMS IN U.S. PATENT NO. 9,900,262

### A. "host"

| **"host"**<br>('262 Patent, Claims 1–17) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "single physical machine including all its software" |

Dkt. No. 81 at 3; Dkt. No. 95 at p. 2 of 10.

Shortly before the start of the September 30, 2026 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning [Note: expressly reject 'single physical machine']."

(1) The Parties' Positions

Plaintiff argues that "[t]he '262 Patent describes hosts functionally, not structurally," and "[a]t no point does the specification state that a 'host' is to *only* be implemented on a physical machine." Dkt. No. 86 at 8 & 9 (citation omitted).

Defendant responds that it proposes "the '262 patent specification's express definition of 'host,'" "[n]othing in the patent suggests a different understanding," and "[t]he specification consistently describes a 'host' as a physical machine consisting of hardware that runs software." Dkt. No. 91 at 3 & 4 (footnote omitted). Defendant also argues that "the patent repeatedly and unambiguously distinguishes the physical host from 'virtual machines.'" *Id.* at 4 (citation omitted). Further, Defendant argues that "[a]ll of NovaCloud's cited statements refer to a virtual machine, *not* a host." *Id.* at 5.

Plaintiff replies that the language relied upon by Defendant "is merely a conditional usage identifying *one* embodiment," and "[a]t no point did the patentee act as his own lexicographer." Dkt. No. 93 at 1. Plaintiff also argues that "[d]epicting hardware components in illustrative figures does not establish a definitional restriction." *Id.* (citation omitted).

At the September 30, 2026 hearing, the parties presented oral arguments as to this term. Defendant emphasized its proposal of "single," and as an alternative proposed construction Defendant proposed "a single machine including all its software." Defendant argued that a "host" must be a single machine and that a virtual machine must run on a single host. Plaintiff responded that a group of multiple machines may be denoted as a single "host." Defendant maintained that construing "host" as referring to a single machine is necessary to avoid a "counting" problem because the claims recite multiple hosts. Defendant argued that one must know what constitutes a single host to be able to identify multiple hosts.

<u>(2) Analysis</u>

Claim 1 of the '262 Patent, for example, recites (emphasis added):

> 1. A method performed by a resource manager in a communications network connected to *at least two hosts* for enabling of resource component allocation related to *the hosts*, the method comprising:
>
> determining a metric of a resource component for performance monitoring of an application at *the hosts*;
>
> transmitting an instruction to measure the metric to each respective *host*;
>
> receiving a respective resource frame of the application from each respective *host*;
>
> determining resource allocation for the application based on the received resource frames; and
>
> combining resource frames coming from *the at least two hosts*;
>
> wherein at least two resource frames form an operations profile of an application using a shared environment; and
>
> wherein the operations profile is dynamic over time.

Claim 9 likewise recites "at least two hosts." Claim 17 recites "for at least two connected hosts."

As a threshold matter, the published international application cited by Plaintiff, to which the ’262 Patent claims priority, refers to a “virtual machine replac[ing] the physical hardware seen from the application or operating system perspective,” but this does not address the meaning of “host” and does not significantly affect the Court’s analysis of the term “host.” Dkt. No. 86, Ex. D, PCT/SE2013/051228 at ¶ 0003; *see id.* at ¶ 0041 (“a plurality of applications 155 potentially operated on different virtual machines 150”).

The specification of the ’262 Patent discloses:

> FIG. 1 shows an overview of the solution in a communications network 50 with a resource manager 110 managing hosts 120. The solution may be operated in a shared environment, a datacenter or a cloud based solution. If it is a cloud based solution, the resource manager 110 may be denoted cloud manager or other similar terms for a node with management or controlling tasks. The hosts 120 may be arranged in different ways. An example of hosts 120 are shown in FIG. 1 with a resource component 130, controlled by a hypervisor 140 and a virtual machine 150. The virtual machine 150 may be an operating system serving an application 155.

’262 Patent at 4:40–51; *see id.* at Fig. 1. The specification thus distinguishes between a “host,” “hypervisor,” and “virtual machine.” The specification also discloses:

> Looking at FIG. 7a and FIG. 7b, the described resource manger 110 and the hosts 120 described above may be implemented, by means of program units of a respective computer program comprising code means which, when run by processors “P” 250 causes the resource manger 110 and the host 120 to perform the above-described actions. The processors P 250 may comprise a single Central Processing Unit (CPU), or could comprise two or more processing units. For example, the processors P 250 may include general purpose microprocessors, instruction set processors and/or related chips sets and/or special purpose microprocessors such as Application Specific Integrated Circuits (ASICs). The processors P 250 may also comprise a storage for caching purposes.

’262 Patent at 8:63–9:19; *see id.* at Fig. 7.

Although this disclosure explains that a host may involve more than one processing unit, this does not address whether a host must be a single physical machine or could be distributed across multiple machines.

The Background section of the specification states:

> It is becoming more common to share hardware platforms among applications. It is further becoming more common to separate computer hardware and applications by virtualizing the hardware. Such solutions may be described as shared environments, clouds, computer clouds, virtual environments, computer centers, hosting environments, or similar.
>
> A shared environment may be created in different ways. An example of a structure is an application operating on an operating system, with the operating system running on a virtual machine. Compared with a single standalone solution may the virtual machine replace the physical hardware seen from the application or operating system perspective. A number of virtual machines may be operated on the same physical hardware. Virtual machines serving the same type of application may be relocated or parallelized between different physical hardware's [*sic*] depending on the applications needs or characteristics, such as availability, performance or capacity.
>
> The virtual machine may be controlled by a hypervisor, where the hypervisor locally may manage the virtual machine on the physical hardware. The hypervisor may for example in a controlled way provide or allocate resources for the virtual machine such as bandwidth, CPU power (Central Processing Unit), memory capacity, or storage capacity. *A single physical machine including all its software may sometimes be denoted a host.*

'262 Patent at 1:19–45 (emphasis added).

This statement that "[a] single physical machine including all its software *may sometimes* be denoted a host" does not rise to the level of a definition or disclaimer that would limit a "host" to being implemented on a single physical machine, particularly when considering also the above-quoted statement that "[i]t is further becoming more common to separate computer hardware and applications by virtualizing the hardware." *Id.*

Further, the specification discloses that the resource frames illustrated in Figure 3 "may originate from the same physical host 120" or "may also originate from different physical hosts 120." *Id.* at 5:14–18. Although this disclosure that multiple physical hosts may be used does not inform whether a particular "host" must be a single machine, the patentee's usage of the phrase "physical host" implies that the word "host" is not inherently limited to a particular physical

machine. *Cf. Phillips*, 415 F.3d at 1314 ("To take a simple example, the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel."). Moreover, although Figure 7b of the '262 Patent appears to illustrate a host with a processor "P" within the host, the description of Figure 7b states that a host can be implemented by a computer program, which weighs against limiting the term "host" to a physical machine. *See* '262 Patent at 8:63–9:19 (reproduced above).

Finally, at the September 30, 2026 hearing, Defendant argued that even if the term is not construed to require a "physical" machine, the term should nonetheless be construed to require a "single machine" to avoid what Defendant referred to as a potential for "arbitrary line-drawing" in Plaintiff's infringement analysis. Any such dispute, however, pertains to potential factual disputes regarding infringement rather than any further legal question for claim construction. Each recited "host" must be distinct, but Defendant does not persuasively justify limiting a "host" to being a single machine. As Plaintiff persuasively responded, the claims do not preclude a group of multiple machines from operating as a single "host."

The Court therefore hereby expressly rejects Defendant's proposed construction, and no further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *Summit 6, LLC v. Samsung*

*Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015); *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 977–79 (Fed. Cir. 2021).

The Court accordingly hereby construes "host" to have its **plain meaning**.

**B. "resource frame of the application"**

| **"resource frame of the application"** ('262 Patent, Claims 1–17) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "representation of an application's resource usage on a single host" |

Dkt. No. 81 at 3; Dkt. No. 95 at p. 3 of 10.

Shortly before the start of the September 30, 2026 hearing, the Court provided the parties with the following preliminary construction: "an application's resource usage on a single host."

<u>(1) The Parties' Positions</u>

Plaintiff argues that "[t]he plain and ordinary meaning of 'frame' is well-known in the art," "[t]he intrinsic record provides several examples of what constitutes a 'frame,'" and "IBM also adds a 'single host' requirement found nowhere in the claim language or specification, for the reasons explained above as to 'host.'" Dkt. No. 86 at 10 (citations omitted).

Defendant responds that "IBM's construction directly reflects the claims' requirements, phrased in a manner that a jury will understand," and "merely clarifies the requirements already present in the claims." Dkt. No. 91 at 7. Defendant also argues that "IBM's construction is consistent with the patent specification and the solution that patent purports to provide." *Id.* at 8. Further, Defendant argues that "[t]he claims expressly require that the resource frame is requested from, provided by, and contains resource information pertaining to a single host." *Id.* at 9.

Plaintiff replies that "frame" is a well-understood term in the art and that "the intrinsic record provides numerous examples of what constitutes a 'frame.'" Dkt. No. 93 at 3. Plaintiff argues: "that each host transmits and receives a resource frame does not mean the resource frame is limited to a single host's resource usage—nothing in the intrinsic record imposes such a requirement." *Id.* at 4.

At the September 30, 2026 hearing, the parties presented oral arguments as to this term. Plaintiff alternatively proposed: "frame containing information about an application's resource usage."

(2) Analysis

The Background section of the specification states:

> There are obvious benefits with shared environments, such as the possibility of a plurality of applications sharing the same hardware, sharing functions such as databases, antivirus protection, firewalls, etc., which may be costly to maintain. Not at least to mention a descent [*sic*] physical environment with shell protection, cooling and constant electricity supply.
>
> However, there are problems with the existing solutions for shared environments, clouds and similar computer center solutions. A problem is an increasing energy need with the growing shared environments, because both the computers themselves as well as the cooling for them require substantial energy supply. It may be desired to be able to turn off machines which not are used. Another problem is to gather adequate information about how to set up and manage applications running in a shared environment, depending on SLA's (Service Level Agreement) and *resource demands*. The structure in a shared environment may be complex and difficult to review.

'262 Patent at 1:52–2:4 (emphasis added).

Claim 1 of the '262 Patent, for example, recites (emphasis added):

> 1. A method performed by a resource manager in a communications network connected to at least two hosts for enabling of resource component allocation related to the hosts, the method comprising:
>
> determining a metric of a *resource* component for performance monitoring of an application at the hosts;
>
> transmitting an instruction to measure the metric to *each respective host*;

> receiving a respective *resource frame of the application from each respective host*;
>
> determining resource allocation for the application based on *the received resource frames*; and
>
> combining *resource frames* coming from the at least two hosts;
>
> wherein at least two resource frames form an operations profile of an application using a shared environment; and
>
> wherein the operations profile is dynamic over time.

Claims 9 and 17 recite "transmit . . ." and "receive . . ." limitations that likewise refer to "an instruction to measure the metric to each respective host" and "a respective resource frame of the application from each respective host."

Plaintiff cites instances of "frame" and "resource frame" in the specification. The examples of "resource components" such as "network interface, memory and CPU (Central Processing Unit)" are informative. *See* '262 Patent at 4:65–5:4. The portions of the specification cited by Plaintiff do not, however, demonstrate any well-known meaning of "resource frame of an application." *See id.* at 2:33–36, 2:58–59, 3:7–9, 3:16–19, 3:41–45, 4:27–34, 4:65–5:4, 6:28–31, 7:37–39, 7:41–46 & 8:40–44; Dkt. No. 86, Ex. D, PCT/SE2013/051228 at ¶¶ 00033, 00054.

Rather, Defendant's proposal of referring to "on a single host" is consistent with the claim reciting: transmitting, to "each respective host," an instruction to measure a metric; and "receiving a respective resource frame of the application from *each respective host*."

As for Defendant's proposal of referring to "an application's resource usage," this is consistent with the claim reciting "determining a *metric of a resource component* for performance monitoring of an *application* at the hosts." This is also consistent with the specification:

> The solution may in a simple way link resources and systems performance by synchronizing on a resource frame basis the *resources metrics of the applications using the resources.*
>
> More specifically, the solution proposes to measure and collect same kind of metrics for resources in consecutive time slots for *resources used by the applications* and to monitor them in a larger resource frame comprising different

> consecutive time slots. That allows understanding of *which and how resources are used, and which applications use them* over each time slot. In a larger resource frame, the methods allows [*sic*] estimating application and infrastructure performance and determining how such performance depends on the measured resource metrics. It therefore may be exploited to control and adapt resources allocation on the basis of applications behavior.
>
> * * *
>
> In an embodiment illustrated in FIG. 3, the *resource frame 170* may be generated to comprise time slots 160, wherein the measured metric is arranged in the time slots 160 of the *resource frame 170*. The figure is an illustrative non limiting example. As shown in the figure, resource components such as network interface, memory and CPU (Central Processing Unit) are shown. Time slots 160 are located in the *resource frames 170*. As illustrated in the figure, there is an application 1, which in the upper *resource frame 170* is rather network intensive and the application 2 is rather memory intensive. In the lower *resource frame 170*, it may be interpreted that the application 1 still appears somewhat network intensive, however not as high as in the upper *resource frame 170*. As illustrated by the example, it may be interpreted that the application 2 is rather CPU intensive and further that the CPU load appears to be cyclic.

*See* '262 Patent at 4:25–39 & 4:65–5:13 (emphasis added); *see id.* at 5:55–6:10.

As for Defendant's proposal of a "representation," introducing this into the construction would tend to confuse rather than clarify the scope of the claims. Rather, at the September 30, 2026 hearing, both sides were amenable to including the word "frame" in the construction of "resource frame of the application."

Finally, at the September 30, 2026 hearing, Defendant argued that a "resource frame of the application" has information about one host, which Defendant argued precludes the resource frame from having information about other hosts. Defendant cited, for example, Figure 6 showing dotted lines to indicate multiple hosts 120, each of which Defendants argued has its own information collection agent 125. Plaintiff persuasively responded that the claims recite no negative limitation regarding information about other hosts. That is, although information must be host-specific

(rather than aggregated) so as to have information about an application's resource usage on a single host, a resource frame is not limited to having *only* information about a single host.

The Court therefore hereby construes "resource frame of the application" to mean **"a frame containing information about the application's resource usage on a single host."**

**C. "operations profile of an application"**

| **"operations profile of an application"**<br>('262 Patent, Claims 1–17) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "representation of an application's resource usage across multiple hosts" |

Dkt. No. 81 at 3; Dkt. No. 95 at p. 3 of 10.

Shortly before the start of the September 30, 2026 hearing, the Court provided the parties with the following preliminary construction: "an application's resource usage across multiple hosts." Defendant agreed with the Court's preliminary construction. Plaintiff opposed.

<u>(1) The Parties' Positions</u>

Plaintiff argues that "[t]he '262 claims and specification broadly describe the 'operations profile of an application' as 'at least two resource frames,'" and "IBM's proposal likewise appears nowhere in the '262 Patent and departs from the plain and ordinary meaning of an 'operations profile of an application.'" Dkt. No. 86 at 11.

Defendant responds that "IBM's construction clarifies the requirements of the phrase 'operations profile of an application' based on the language of the claims." Dkt. No. 91 at 9. Defendant also argues that "IBM's construction is consistent with the specification and purpose of the alleged invention," and "[t]he prosecution history is not relevant to the construction of 'operations profile of an application.'" *Id.* at 10.

Plaintiff replies that Defendant's proposal of "representation" should be rejected because it "imposes a static gloss onto what the claims make clear is a dynamic construct." Dkt. No. 93 at 4.

At the September 30, 2026 hearing, the parties presented oral arguments as to this term. Plaintiff alternatively proposed: "two or more frames containing information about an application's resource usage."

(2) Analysis

Claim 1 of the '262 Patent, for example, recites (emphasis added):

> 1. A method performed by a resource manager in a communications network connected to at least two hosts for enabling of resource component allocation related to the hosts, the method comprising:
>
> determining a metric of a resource component for performance monitoring of an application at the hosts;
>
> transmitting an instruction to measure the metric to each respective host;
>
> receiving a respective resource frame of the application from each respective host;
>
> determining resource allocation for the application based on the received resource frames; and
>
> combining resource frames coming from the at least two hosts;
>
> wherein at least two resource frames form an *operations profile of an application* using a shared environment; and
>
> wherein the operations profile is dynamic over time.

Claims 9 and 17 likewise recite "wherein at least two resource frames form an operations profile of an application using a shared environment." The claims themselves thus recite that resource frames "form" an operations profile. *See also* '262 Patent at 3:20–24 ("form an operations profile").

At the September 30, 2026 hearing, Plaintiff argued that the "at least two resource frames" that "form an operations profile" are not necessarily the same resource frames recited in the step of "combining resource frames coming from the at least two hosts." Plaintiff is proposing an unnatural reading, particularly when read in the context of Claim 1 as a whole. The claim recites

being connected to at least two hosts, receiving a resource frame from each host, and combining resource frames "from the at least two hosts." These recitals are followed immediately by the "wherein" clause that introduces an "operations profile of an application" that is formed by at least two resource frames. Read in context, these two resource frames are from different hosts. The operations profile thus pertains to an application's resource usage across multiple hosts. Claims 9 and 17 are similar in this regard.

The portions of the specification cited by Plaintiff do not state otherwise. *See* '262 Patent at 5:55–6:10 & 7:64–67. The prosecution history cited by Plaintiff likewise does not demonstrate otherwise. *See* Dkt. No. 86, Ex. D, PCT/SE2013/051228 at ¶ 00040; *see also id.*, Ex. E, Nov. 22, 2017 Amendments to the Claims; *id.*, Ex. F, Jan. 4, 2018 Notice of Allowability.

The Court therefore hereby construes "operations profile of an application" to mean **"a profile of an application's resource usage across multiple hosts."**

## V. DISPUTED TERMS IN U.S. PATENT NO. 8,407,348

### D. "activity threshold value"

| **"activity threshold value"**<br>('348 Patent, Claims 1–3, 5–15, 17) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "threshold number of packets that is used to determine if a service is deemed active or inactive" |

Dkt. No. 81 at 2; Dkt. No. 95 at p. 5 of 10.

Shortly before the start of the September 30, 2026 hearing, the Court provided the parties with the following preliminary construction: "a number of packets that is used to determine if a

service has been active or inactive during a period of time." Defendant agreed with the Court's preliminary construction. Plaintiff opposed.

(1) The Parties' Positions

Plaintiff argues that "[c]ontrary to IBM's proposal, neither the claims themselves nor specification support limiting the 'activity threshold value' to a 'number of packets,'" and "[t]he claims do not limit an 'activity threshold value' to a particular unit of measurement." Dkt. No. 86 at 12 (citations omitted). Plaintiff argues that "IBM's proposal improperly limits the claims to a single embodiment and cannot be correct." *Id.* at 13 (citations omitted).

Defendant responds that "NovaCloud does not dispute that 'activity threshold value' is a coined term," and "IBM's construction is the patent specification's definition of that coined term." Dkt. No. 91 at 13 (citation omitted); *see id.* at 13–14. Defendant also argues that "because the patent identifies management traffic by measuring packets, measuring an activity threshold value using some other unit could not distinguish user traffic from management traffic—which is precisely the function NovaCloud asserts defines the invention." *Id.* at 14. Further, Defendant argues that "NovaCloud identifies nothing in the patent that is inconsistent with an activity threshold value that is measured in packet numbers." *Id.* at 15.

Plaintiff replies that this is not a coined term. Dkt. No. 93 at 5. Plaintiff also argues that the "broader functional descriptions demonstrate that the patentees understood the activity threshold value as a general concept, not one limited to packets." *Id.* at 6 (citing '348 Patent at 2:23–34, 3:18–21 & 5:7–9). Further, Plaintiff argues that "[a] person of ordinary skill in the art would understand that there are multiple ways to determine whether a service is 'active'—packet counts being one, with bandwidth utilization, data throughput, connection status, or other metrics being others." *Id.* at 6.

At the September 30, 2026 hearing, the parties presented oral arguments as to this term. Plaintiff alternatively proposed: "parameter that is used to determine if a service has been active or inactive during a period of time."

(2) Analysis

Claim 1 of the '348 Patent, for example, recites (emphasis added):

> 1. A method of monitoring a user's usage of a network service, comprising:
> recording a length of time that a service in the network was considered active relative to *a predefined activity threshold value*;
> recording an average loading of the network service during the time that the network service was considered active relative to *the activity threshold value*; and
> recording a length of time in which the network service was considered saturated relative to a predefined saturation threshold value.

The specification states:

> An activity count (ACTV) *is* a measure of the length of time that the service was considered *active*. To calculate an active sampling period, or in this embodiment an active second, an *activity threshold* is defined by the operator, which is used to *determine if the period should be deemed active or inactive. The activity threshold is measured in numbers of packets* and is used to filter out packets that are used by the operator to manage the service, such as Bridge Protocol Data Units and Operations and Administration packets. Thus, the activity threshold is typically set to the average number of management packets that are transported by the service per sampling period. The activity count ACTV is therefore only incremented when the number of packets monitored is greater than or equal to the activity threshold and thus an active sampling period is declared.

'348 Patent at 5:4–18 (emphasis added). This statement appears in the Detailed Description section of the specification, but it appears as part of a discussion of "[t]he method of the invention" and in a series of paragraphs that each begins by setting forth a term and stating what the term "is," which is consistent with the patentee having set forth a definition. *Id.* at 4:44 & 5:4–48; *see Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007). The patentee defined the term, and "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citation omitted).

Alternatively, and in addition, Plaintiff does not persuasively show that "activity threshold value" has any well-established meaning outside of the '348 Patent, so the manner in which the specification uses the term is especially probative of its meaning. *See Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010) ("Idiosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification.").

Referring to packets is also consistent with disclosure that the "number of packets received in each second is compared to the activity threshold and if greater than or equal to this value an active second is declared." '348 Patent at 6:40–42.

At the September 30, 2026 hearing, Plaintiff emphasized statements in the Background section of the specification regarding "Mbits/s" and "bytes":

> An Ethernet network operator supplies connections across their Ethernet transport network to a customer (hereinafter referred to as the user). When a user buys a connection they will typically negotiate a Service Level Agreement (SLA), which defines various parameters and limits of the connection. For example, the following elements may be defined. The Committed Information Rate (CIR), which is the average data bandwidth in *Mbits/s* that is guaranteed to be transported. The Peak Information Rate (PIR), which is the average peak information rate in *Mbits/s* that is available between the various users. The Committed Burst Size (CBS), which is specified in *bytes* and denotes the maximum number of *bytes* available for a burst of ingress data at the UNI (User to Network Interface) speed to remain CIR conformant. The Peak Burst Size (PBS), which is specified in *bytes* and denotes the maximum number of *bytes* available for a burst of ingress data at the UNI speed to remain PIR conformant.

'348 Patent at 1:28–46 (emphasis added). These statements, however, pertain to how a Service Level Agreement ("SLA") is defined, not to how the patentee used the term "activity threshold value."

Additional disclosures cited by Plaintiff do not demonstrate any other way of measuring an activity threshold. *See id.* at 2:32–34 ("Preferably, the service is determined as being active by comparing the present activity to a predefined activity threshold value."), 3:18–21 ("The activity

threshold can be used to ensure that only service traffic initiated by the user is used in the collation of the data values and network management traffic is ignored.") & 5:7–9 ("To calculate an active sampling period, or in this embodiment an active second, an activity threshold is defined by the operator, which is used to determine if the period should be deemed active or inactive"). At the September 30, 2026 hearing, Plaintiff argued in particular that the disclosure of "traffic" is broader than packets (*id.* at 3:18–21), but this reference to "traffic" does not specify any other metric and is not inconsistent with the patentee having defined "activity threshold value" based on packets.

The Court therefore hereby construes "activity threshold value" to mean **"a number of packets that is used to determine if a service has been active or inactive during a period of time."**

**E. "loading"**

| **"loading"**<br>('348 Patent, Claims 1–3, 5–15, 17) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "percentage of the bandwidth of the service used against that which is actually available" |

Dkt. No. 81 at 2.

Shortly before the start of the September 30, 2026 hearing, the Court provided the parties with the following preliminary construction: "percentage of the bandwidth of the service used against that which is actually available each sampling period."

<u>(1) The Parties' Positions</u>

Plaintiff argues that "[t]he claims require only that an 'average loading' be recorded; they say nothing of bandwidth or percentages." Dkt. No. 86 at 14. Plaintiff also argues that "IBM appears to conflate 'average loading' with 'raw utilisation'—which is expressed as a percentage—

but this lacks support." *Id.* Further, Plaintiff argues that "[t]he '348 Patent concerns network services, bandwidth, CIR/PIR, and utilization where 'loading' refers to the burden or use placed on the network service, not to any particular reporting unit such as percentage." *Id.* at 14 (citation omitted).

Defendant responds that "'[l]oading' is not a term of art; it is a term that the patentee coined," and "the specification defines 'average loading' as the average raw utilisation and equates 'loading' with raw utilisation—which . . . is the 'percentage of the bandwidth of the service used against that which is actually available.'" Dkt. No. 91 at 16–17 (citing '348 Patent at 5:27–29). Defendant argues that Plaintiff "offers no basis in the specification for a broader understanding than what is articulated in IBM's construction." *Id.* at 17.

Plaintiff replies:

> The specification's chain of derivation is clear: "raw utilisation" is measured each sampling period and "then averaged on an ongoing basis over the recording period." '348 Patent at 5:22-24. The result of that averaging is the "utilisation statistic," which "represents the average loading during the time that the service was considered active over the recording period." *Id.* at 5:25-27. Thus, the specification's chain is: raw utilisation (per-sampling-period measurement) → averaged over time → utilisation statistic = average loading. IBM skips the critical averaging step and equates "loading" directly with "raw utilisation," which the specification describes only represents—but is not equivalent to—the average loading.

Dkt. No. 93 at 7. Plaintiff also argues that "[a] person of ordinary skill in networking would understand 'loading' to mean the burden or utilization placed on a network service, consistent with the ordinary meaning of the term in the field," and "IBM has not shown—through expert testimony, technical dictionaries, or any other evidence—that a person of ordinary skill would understand 'loading' to be a coined term or limited to a percentage." *Id.*

At the September 30, 2026 hearing, the parties presented oral arguments as to this term. For example, Plaintiff argued that "loading" is an amount, not a percentage or ratio. Defendant

responded that the specification defines "loading" as a percentage. Alternatively, Defendant argued that this is a coined term that must be limited to the specification's use of the term. Defendant submitted that it would be amenable to a construction referring to a ratio, proportion, or fraction, but Defendant maintained that "loading" is a relative measurement that is defined in relation to what is available.

(2) Analysis

Claim 1 of the '348 Patent, for example, recites (emphasis added):

> 1. A method of monitoring a user's usage of a network service, comprising:
> recording a length of time that a service in the network was considered active relative to a predefined activity threshold value;
> recording an average *loading* of the network service during the time that the network service was considered active relative to the activity threshold value; and
> recording a length of time in which the network service was considered saturated relative to a predefined saturation threshold value.

Plaintiff cites disclosure that "[p]referably the data values collected include an utilisation statistic, which represents the average loading of the service during the time that the service was considered active" (*id.* at 2:35–37), and Plaintiff argues that this average loading or "utilisation statistic" is not limited to a percentage. Dkt. No. 86 at 14.

The specification also discloses:

> An utilisation statistic (UTIL) is derived from *measuring a raw utilisation* of the service each sampling period, which is then *averaged* on an ongoing basis over the recording period. The utilisation statistic *represents the average loading* during the time that the service was considered active over the recording period. *Raw utilisation is calculated as a percentage* of the bandwidth of the service used against that which is actually available each sampling period.

*Id.* at 5:22–29 (emphasis added).

This description of "utilisation statistic" aligns with the recital of "average loading of the network service during the time that the network service was considered active" in above-reproduced Claim 1 of the '348 Patent. The other independent claim, Claim 10 of the '348 Patent,

similarly recites "average loading of the service during the time that the service was considered active."

The association between the claim term "loading" and the descriptions of "utilisation statistic" and "raw utilisation" is somewhat attenuated, so this disclosure does not rise to the level of a clear lexicography as to "loading."

Nonetheless, Plaintiff does not persuasively show, through any expert opinion or otherwise, that the "loading" of a network service has any well-established meaning outside of the '348 Patent, so the manner in which the specification uses the term is especially probative of its meaning. *See Intervet*, 617 F.3d at 1287 ("Idiosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification."). Alternatively, and in addition, even if "loading" were deemed to have some relevant meaning in the art, the specification demonstrates that the patentee used the term in a particular way. The above-reproduced disclosure of utilisation statistic aligns with the recital of "average loading" in the claims, and in this disclosure the patentee described utilisation as a relative measurement of bandwidth used as compared to bandwidth available. *See* '348 Patent at 5:22–29.

Other disclosures cited by Plaintiff do not show otherwise. For example, the Background section of the specification states:

> An Ethernet network operator supplies connections across their Ethernet transport network to a customer (hereinafter referred to as the user). When a user buys a connection they will typically negotiate a Service Level Agreement (SLA), which defines various parameters and limits of the connection. For example, the following elements may be defined. The Committed Information Rate (CIR), which is the average data bandwidth in *Mbits/s* that is guaranteed to be transported. The Peak Information Rate (PIR), which is the average peak information rate in *Mbits/s* that is available between the various users. The Committed Burst Size (CBS), which is specified in bytes and denotes the maximum number of bytes available for a burst of ingress data at the UNI (User to Network Interface) speed to remain CIR conformant. The Peak Burst Size (PBS), which is specified in bytes and denotes

> the maximum number of bytes available for a burst of ingress data at the UNI speed to remain PIR conformant.

’348 Patent at 1:28–46 (emphasis added). This disclosure refers to “bandwidth” and “information rate” in “Mbits/s,” but these statements relate to a Service Level Agreement (SLA) “[w]hen a user buys a connection” and do not affect how the patentee used “loading” when discussing “average loading” and “utilisation.” *See id.* at 5:22–29.

Additional disclosures are consistent with this understanding. An example of a utilisation statistic (“UTIL”) appears in Table 1 with a value of “68%” listed. *Id.* at 8:45; *see id.* at 5:54–55 (“FIG. 2 shows a graph of raw utilisation (as a percentage) versus time (in sampling periods, i.e. seconds).”). Also, in Figure 3, “[t]he vertical axis represents the level of raw utilisation as a percentage.” *Id.* at 8:29–30.

The Court therefore hereby construes “loading” to mean **“relative measurement of the bandwidth of the service used as compared to the bandwidth actually available each sampling period.”**

### F. “saturation threshold value”

| **“saturation threshold value”**<br>(’348 Patent, Claims 1–3, 5–15, 17) | |
|---|---|
| **Plaintiff’s Proposed Construction** | **Defendant’s Proposed Construction** |
| Plain and ordinary meaning | “percentage representing the loading at which the operator considers the service saturated” |

Dkt. No. 81 at 3.

Shortly before the start of the September 30, 2026 hearing, the Court provided the parties with the following preliminary construction: “percentage that represents the loading at which the

network considers the service saturated." Defendant agreed with the Court's preliminary construction. Plaintiff opposed.

(1) The Parties' Positions

Plaintiff argues that "[t]he claims do not require that the saturation threshold value be expressed as a percentage (or in any particular form)," and "[t]he word 'percentage' appears only in an embodiment and is not definitional." Dkt. No. 86 at 15 (citation omitted). Plaintiff also argues that Defendant's proposal improperly "injects a human element into the claim—i.e., that the operator must consider the service saturated at the saturation threshold value." *Id.* at 16.

Defendant responds that this disputed term "is another coined term," and "[t]he specification defines the term by stating that '[t]he saturation threshold is a percentage and represents the raw utilisation at which the operator considers the service saturated.'" Dkt. No. 91 at 18 (citing '348 Patent at 5:32–34). Defendant also argues that "[t]he specification consistently refers to the saturation threshold value as a percentage." *Id.* at 19. Further, Defendant argues that the statements in the Summary section of the specification cited by Plaintiff "merely state how the saturation *count* (a different data value) is determined using the saturation threshold value (['348 Patent at] 2:40–42) and what the threshold is *for* ([*id.* at] 3:21–23)." *Id.* As for Defendant's proposal of referring to "the operator," Defendant argues that "the reference to the 'operator' is taken directly from the specification," which "identifies the source of the saturation threshold value, which is predefined, not a human mental step performed while the method runs." *Id.* at 20 (citing *id.* at 5:33–34).

Plaintiff replies that "[t]he specification describes the saturation threshold value as a general concept—a predefined value against which usage is measured—without tying it to any particular unit," and "[t]hat the embodiment depicted uses percentages does not mean the claims

require them." Dkt. No. 93 at 8. Plaintiff also argues that "[h]ow or why the value was chosen, and who or what chose it, is irrelevant to claim scope." *Id.* at 8–9.

At the September 30, 2026 hearing, the parties presented oral arguments as to this term. Plaintiff argued that the saturation threshold is not limited to any particular representation and could be an amount rather than a percentage. As an alternative proposed construction, Plaintiff proposed: "value that represents the loading at which the network considers the service saturated." Defendant responded, for example, that even if the specification is deemed to not set forth a lexicography, "saturation threshold value" is a coined term that must be limited to how the specification uses the term.

(2) Analysis

Claim 1 of the '348 Patent, for example, recites (emphasis added):

> 1. A method of monitoring a user's usage of a network service, comprising:
> recording a length of time that a service in the network was considered active relative to a predefined activity threshold value;
> recording an average loading of the network service during the time that the network service was considered active relative to the activity threshold value; and
> recording a length of time in which the network service was considered saturated relative to a predefined *saturation threshold value*.

Claim 10 likewise recites "an input configured to receive an activity threshold value, a saturation threshold value, and a recording period value," and "a data collector configured to record a length of time in which the network service was considered saturated relative to the saturation threshold value."

The specification discloses:

> A saturation sampling period count (SAT) is defined as the number of sampling periods in which the raw utilisation equals or exceeds a predefined saturation threshold. *The saturation threshold is a percentage and represents the raw utilisation at which the operator considers the service saturated.* Thus, each sampling period, if the raw utilisation equals or exceeds the saturation threshold

> then the SAT count is incremented and then stored for later analysis at the end of the recording period.

’348 Patent at 5:30–38 (emphasis added).

This statement appears in the Detailed Description section of the specification, but it appears as part of a discussion of “[t]he method of the invention” and in a series of paragraphs that each begins by setting forth a term and stating what the term “is,” which is consistent with the patentee having set forth a definition. *Id.* at 4:44 & 5:4–48; *see Sinorgchem*, 511 F.3d at 1136. The patentee defined the term, and “the inventor’s lexicography governs.” *Phillips*, 415 F.3d at 1316 (citation omitted). Alternatively, and in addition, Plaintiff does not persuasively show that “saturation threshold” has any well-established meaning outside of the ’348 Patent, so the manner in which the specification uses the term is especially probative of its meaning. *See Intervet*, 617 F.3d at 1287 (“Idiosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification.”).

Construing the saturation threshold as a percentage is further consistent with Figure 3 of the patent, in which “[t]he vertical axis represents the level of raw utilisation as a percentage,” and “[t]he saturation threshold is marked on the graph as a horizontal line.” ’348 Patent at 8:29–31. The specification discloses that “[t]he raw utilisation is compared to the saturation threshold and if it is greater than or equal to this value then a saturated second is declared.” *Id.* at 6:42–44. This further reinforces that the saturation threshold is a percentage because the specification describes raw utilisation as being a percentage. *Id.* at 5:22–29.

Plaintiff cites disclosure regarding “determining the length of time that the user’s usage equals or exceeds a predefined saturation threshold” (*id.* at 2:40–42) and that “[t]he use of a saturation threshold enables the operator to determine when the service is reaching or has reached its capacity” (*id.* at 3:21–23), but these are not inconsistent with the above-discussed lexicography.

The absence of any percentage indication in Figure 2 (cited by Plaintiff) likewise does not undercut the patentee's lexicography. Dkt. No. 86 at 16 (citing '348 Patent at 4:23–24 & Fig. 2).

Finally, Plaintiff argues that referring to "the operator" would improperly introduce a "human element" into the claims, but the specification expressly refers to a network operator in the above-reproduced disclosure. Also, Claim 1 recites that the threshold is "predefined," and Claim 10 recites that the threshold is received as an "input." This predefined input is from the network operator, which is an entity rather than necessarily a particular person. *See* '348 Patent at 4:32–34 ("In the embodiment of the Figures an Ethernet transport network operator uses the method of the invention to monitor the service traffic distribution of a user over time."); *see also id.* at 4:34–37; *id.* at 4:46–47 ("The operator provides network connections or services . . . to a plurality of users . . . ."). To avoid potential confusion regarding whether an "operator" must be a person, the construction should refer to the "network" rather than to the "operator." At the September 30, 2026 hearing, neither side opposed this portion of the Court's preliminary construction.

The Court therefore hereby construes "saturation threshold value" to mean **"percentage that represents the loading at which the network considers the service saturated."**

## VI. DISPUTED TERM IN U.S. PATENT NO. 10,691,480

### G. Claim 1 of the '480 Patent

| **"modifying an injection virtual machine (VM) image to include injection data, wherein the virtual application VM image is a template for instantiating a virtual application VM that implements the virtual application, wherein the injection data includes two or more of: a script, a configuration file, and a public key that corresponds to a private key included in the injection VM image to enable secure communications between the virtual application VM and the injection VM"** ('480 Patent, Claim 1) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Judicially correct claim 1's third limitation to modify a "virtual application VM image," rather than "an injection virtual machine (VM) image." | No judicial correction warranted. |

Dkt. No. 95 at p. 7 of 10; *see* Dkt. No. 86 at 17; *see also* Dkt. No. 81; *id.* at Ex. A.

Shortly before the start of the September 30, 2026 hearing, the Court provided the parties with the following preliminary construction: "Expressly reject Plaintiff's request for judicial correction of Claim 1 of the '480 Patent."

<u>(1) The Parties' Positions</u>

Plaintiff submits that "[i]n issuing its Listing of Allowed Claims with the Notice of Allowance, the USPTO correctly identified the appropriate claim language," and "[t]he misprint in claim 1, among others, did not occur until the '480 Patent was printed and issued." Dkt. No. 86 at 5 (citation omitted). Plaintiff also submits that "[t]he USPTO has already acknowledged this misprint and properly issued a certificate of correction on this claim, as well as others." *Id.* at 17 (citation omitted). Plaintiff argues that "[b]oth the claim language and the specification support the requested correction, and that correction alone." *Id.* at 18; *see id.* at 18–19. Further, Plaintiff submits that the prosecution history does not suggest a different interpretation. *Id.* at 19–20.

Defendant responds that Plaintiff's proposed construction is "not a 'minor' or 'typographical' correction," and "[i]t is of a different scale and materiality than the judicial corrections that the Federal Circuit has previously approved." Dkt. No. 91 at 23. Defendant also argues that "the purported error is not immediately obvious from the face of the patent." *Id.* Defendant submits that the lack of an antecedent for the recital of "the virtual application VM image," cited by Plaintiff, "does not make clear which clause of the claim contains an error." *Id.* at 24. Further, Defendant argues that "the specification does not indicate that 'modifying a virtual application VM image' is the only reasonable correction to the third claim limitation, and indeed describes it as just one exemplary or 'optional' embodiment." *Id.* at 25. Finally, Defendant cites authority that a patent printing error is insufficient to support judicial correction. *Id.* at 26 (citing *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1334 (Fed. Cir. 2014)).

Plaintiff replies that "[d]espite arguing that the correction of the obvious error is subject to reasonable debate, IBM offers no reasonable alternative correction." Dkt. No. 93 at 10. Plaintiff also cites *Canatex Completion Solutions, Inc. v. Wellmatics, LLC*, 159 F.4th 39, 41 (Fed. Cir. 2025), as authority demonstrating that replacing one component with another can be a permissible judicial correction. *Id.* at 9.

At the September 30, 2026 hearing, the parties presented oral arguments as to this term.

<u>(2) Analysis</u>

The parties agree that Claim 1 of the '480 Patent issued with a printing error by the USPTO. *Compare* '480 Patent, Claim 1 *with* Dkt. No. 86, Ex. J, Listing of the Allowed Claims. Claim 1 of the '480 Patent, in its as-issued form, is reproduced here (emphasis added):

> 1. A method by a computing device to configure and monitor a virtual application in a cloud environment, comprising:
>
> generating instructions for configuring and monitoring the virtual application based on configuration data for the virtual application;

> modifying an injection virtual machine (VM) image to include the instructions for configuring and monitoring the virtual application, wherein the injection VM image is a template for instantiating an injection VM that is to configure and monitor the virtual application according to the instructions;
>
> *modifying an injection virtual machine (VM) image* to include injection data, wherein the virtual application VM image is a template for instantiating a virtual application VM that implements the virtual application, wherein the injection data includes two or more of: a script, a configuration file, and a public key that corresponds to a private key included in the injection VM image to enable secure communications between the virtual application VM and the injection VM;
>
> modifying a virtual application deployment descriptor for the virtual application to indicate that the injection VM is to be injected into the virtual application; wherein the virtual application deployment descriptor includes a reference to the virtual application VM image; and
>
> causing the virtual application, with the injection VM, to be deployed in the cloud environment using the modified virtual application deployment descriptor.

After Plaintiff filed its Complaint in the present suit, Plaintiff applied for and obtained a Certificate of Correction to replace "modifying an injection virtual machine (VM) image" with "modifying a virtual application VM image" (among other corrections that are not here at issue). Dkt. No. 86, Ex. H, Sept. 30, 2025 Certificate of Correction; *see* Dkt. No. 1, Complaint.

A "certificate of correction is only effective for causes of action arising after it was issued." *See Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1356 (Fed. Cir. 2003) (citation and internal quotation marks omitted). The parties dispute whether the pre-Certificate-of-Correction version of the claim should be judicially corrected, which would be retroactive.

Judicial correction of an error in a patent may be available "only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Id.* at 1357; *see Grp. One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1303 (Fed. Cir. 2005) ("we have held that in some circumstances the district court can correct errors retroactively"; discussing *Novo*). As long as these requirements are met, "judicial correction may result in structural alterations." *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, 35 F.4th 1367, 1374 (Fed. Cir. 2022)

(“nothing in our case law precludes district courts from correcting obvious minor errors that alter the claimed structure”).

In the present case, correcting the claim to match the language in the prosecution history would not be clear on the face of the patent. Of particular note, whereas Plaintiff proposes removing the word “injection” in the third limitation, the second limitation recites “injection” (“modifying an injection virtual machine (VM) image . . .”), so the presence of an error in the third limitation is not “evident from the face of the patent” and is not “obvious.” *Canatex Completion Solutions, Inc. v. Wellmatics, LLC*, 159 F.4th 39, 46 (Fed. Cir. 2025) (citations omitted). Plaintiff argues that the presence of an error is obvious based on the recital of “the virtual application VM image” later in the third limitation (Dkt. No. 86 at 18), but this is not sufficient, especially when considering that the phrase “virtual application” appears in the preamble and in every limitation in the body of the claim. At least for purposes of assessing Plaintiff’s proposed judicial correction, the instance of “the virtual application VM image” cited by Plaintiff could relate to a preceding instance of “virtual application” rather than purportedly demonstrating an obvious error.

Similarly, even if the presence of “injection” in the third limitation were assumed to be an obvious error, the proposed correction of replacing “modifying an injection virtual machine (VM) image” with “modifying a virtual application VM image” is not obvious on the face of the patent. *Canatex*, 159 F.4th at 46. Plaintiff argues that “the specification consistently and exclusively depicts” Plaintiff’s proposed reading of the claim. Dkt. No. 86 at 19 (quoting *Pavo*, 35 F.4th at 1377). Plaintiff cites disclosure that “[i]njection data is data that is added to the virtual application VM image” and similar disclosures. ’480 Patent at 7:11–12; *see id.* at 8:64–66 (“modify . . . virtual application VM images to include injection data”), 9:50–60 (“one or more of the virtual application VM images 330 is modified to include injection data 340”), 10:6–7 (“The virtual application VM

160 includes injection data 340.") & 10:58–59 ("In one embodiment, the computing device 100 modifies a virtual application VM image to include injection data (block 530)."). Plaintiff also cites Figures 3 and 4 of the '480 Patent as "depicting the virtual application VM image receiving the injection data," and Plaintiff cites Figure 5 as "the flow diagram corresponding to claim 1 identifying the third limitation as "modify *a virtual application VM image* to include injection data." Dkt. No. 86 at 19 (emphasis Plaintiff's).

As Defendant argues, however, the specification discloses modifying a virtual application VM image to include injection data as an "embodiment." '480 Patent at 7:8–11 ("In one embodiment, the virtual application injection component 110 obtains a virtual application VM image from a data store 170 and modifies/customizes it to include injection data."); *see also id.* at 8:44–46 ("Exemplary operations for configuring and monitoring a virtual application 130 using an injection VM 150 are described below."); *id.* at 8:63–66, 9:58–60 & 10:58–60 (similar). As for Figures 3, 4, and 5 cited by Plaintiff, the specification notes that "[b]racketed text and blocks with dashed borders (e.g., large dashes, small dashes, dot-dash, and dots) may be used herein to illustrate optional operations that add additional features to certain embodiments" ('480 Patent at 4:7–10), and Figure 5 illustrates "Modify a virtual application VM image to include injection data (530)" with a dashed-line box. At a minimum, even assuming that a claim error is apparent, the specification gives rise to reasonable debate regarding the proposed correction.

Thus, because the presence of an error is not apparent on the face of the patent, and because the proposed correction is subject to reasonable debate based on the claim language and the specification, judicial correction is not appropriate. *See Novo*, 350 F.3d at 1357. Rather, the applicable principle is that "major errors are subject only to correction by the PTO." *Id.* Judicial correction is inappropriate here regardless of whether the error may have occurred without any

fault of the patentee (assuming, without deciding, that the patentee had no duty to verify that the language of the issued claims matched the claim language as it stood at the time of allowance). *See Grp. One*, 407 F.3d at 1303 ("the district court can correct an error only if the error is evident from the face of the patent"); *see also H-W Tech*, 758 F.3d at 1334 (reaffirming *Group One*); *Canatex*, 159 F.4th at 46.

The Court therefore hereby **expressly rejects Plaintiff's request for judicial correction of Claim 1 of the '480 Patent.**

## VII. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 3rd day of October, 2026.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

## APPENDIX – AGREED CONSTRUCTIONS

| Term | Agreed Construction |
|---|---|
| "edge node"<br>('028 Patent, Claims 1–7, 9–12) | "Network node positioned at the edge of a network between the host entity and the requested network service" |
| Order of Steps<br>('651 Patent, Claims 1, 9, 17) | The "select" / "selecting" step must occur before the "determine" / "determining" step, which must occur before the "update" / "updating" step. |
| "steering module"<br>('063 Patent, Claims 1–26) | "Module that steers packets between services in a network" |
| "topological location"<br>('063 Patent, Claims 1–26) | "The location of a service instance in a network topology" |
| "Injection VM"<br>('480 Patent, Claims 1–16) | "Special-purpose virtual machine that is injected into a virtual application to configure and monitor the virtual application" |

Dkt. No. 81 at 1–2; Dkt. No. 95 at p. 2 of 10.